# United States Court of Appeals
## For the First Circuit

No. 02-1519

JOSEPH BENOIT,

Plaintiff, Appellant,

v.

TECHNICAL MANUFACTURING CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, <u>U.S. District Judge</u>]

Before

Lynch, Lipez and Howard,
<u>Circuit Judges</u>.

Matthew Cobb, with whom <u>Law Office of Matthew Cobb</u> was on brief, for appellant.
Mark A. Walsh, with whom <u>LeBoeuf, Lamb, Greene & MacRae, LLP</u> was on brief, for appellee.

June 9, 2003

**HOWARD**, **<u>Circuit Judge</u>**. Plaintiff-appellant Joseph Benoit ("Benoit") appeals an award of summary judgment to defendant Technical Manufacturing Corporation ("TMC") on his claims of discrimination and retaliation on account of disability, race, color, and national origin in violation of a number of federal and Massachusetts statutes. Agreeing with the district court that no genuine issue of material fact exists, we affirm.

I.      **FACTUAL BACKGROUND**

Benoit is a black male of Haitian origin. In October 1991, TMC hired Benoit as a "finisher." TMC manufactures specialized optical and laboratory tables and tabletop platforms. Benoit's job duties included checking the flatness of completed tables, installing table siding and corners, building wooden crates for the tables, and crating the finished tables for shipping. Benoit was an at-will employee.

A.      <u>Job Performance</u>

Benoit was a capable worker who consistently received above-average annual ratings for his job performance. His skills and ability were recognized by his former supervisors, David Byrne and Manuel Eugenio, as well as by the owner of TMC, Ulf Heide. Heide described Benoit as a "very talented employee" who was "capable of very good work." But this did not mean that Benoit's experience at TMC was a smooth one. Although Benoit displayed technical proficiency, he was late or absent during the work week

for 35 out of 52 weeks in 1996, 28 out of 52 weeks in 1997, and 8 out of 12 weeks in 1998, the year in which he was fired. TMC fired seven employees for excessive absenteeism between 1995 and 1999, five of whom were white.

Benoit's annual performance evaluations reflected both his above-average work performance and his problems with tardiness and absenteeism. In 1995 and 1996, Benoit received many ratings of "exceptional" for his work ability, yet received the lowest possible rating for attendance and punctuality. His boss, Eugenio, frequently reprimanded Benoit about this behavior.

On September 23, 1996, Benoit received a formal written warning that identified his lateness as habitual and cautioned him that if it continued, he would be disciplined with a two-day suspension. TMC's employment handbook states that "[p]oor attendance and excessive tardiness are disruptive. Either may lead to disciplinary action, up to and including termination of employment." The handbook also describes the various kinds of disciplinary action that may be taken at TMC's discretion, including verbal warnings, written warnings, suspension, and termination. Although the section entitled "Progressive Discipline" indicates that these steps will "normally" be followed in order, the handbook also states that under some circumstances one or more of the steps may be bypassed altogether.

On March 3, 1997, Eugenio, Heide, Teresa Drelick (TMC's Vice President and Chief Financial Officer), and Jim Hansen (TMC's Vice President of Manufacturing) spoke with Benoit about his attendance problems. After this meeting, Benoit's punctuality and dependability improved somewhat. In October 1997, Benoit's performance evaluation noted this improvement but stated that Benoit's attendance "still needed work." Benoit's more regular attendance additionally allowed him to compete in the "attendance pool": an incentive scheme that allowed those employees who had perfect attendance for one month to submit their names for a cash prize. Benoit won this pool on three or four separate occasions.

Despite his improved attendance, Benoit was ultimately fired on March 30, 1998, without any further written warning, and without any suspension prior to termination.

B.    Work Relations

Benoit had other conflicts at work, all of which involved Eugenio and Hansen. One day in July 1995, Benoit wanted to leave early, and he and a co-worker, Steve Maxwell, agreed that Maxwell would finish Benoit's work for him. When Benoit told Eugenio that he would be leaving early, Eugenio questioned his decision but allowed him to go.

Immediately upon his return the next day, Benoit was told by Eugenio to complete the work he had left unfinished the previous day. When Benoit asked Maxwell why the work was not completed,

-4-

Maxwell explained that Eugenio would not let him finish Benoit's work. Benoit confronted Eugenio, who began to yell at Benoit for failing to finish the work. Benoit asked to see Hansen immediately. Eugenio agreed, but told Benoit that he had to wait "outside." Interpreting this comment as a demand that he leave the building, Benoit waited outside in the equipment yard until Hansen arrived. Benoit felt that this treatment was unfair and demeaning. After speaking with Benoit, Hansen supported Eugenio.

Benoit eventually complained to Hansen, on February 18, 1997, that Eugenio routinely treated him worse than his white and Asian co-workers. Benoit stated that Eugenio's disparate treatment was evident from Eugenio's practices of disciplining him in front of everyone and writing him up for his poor attendance even when he had an excuse. Benoit also made reference to a number of specific incidents, including the unfinished work incident in 1995, an incident during which Eugenio screamed at Benoit because he left his work station two minutes before break to use the men's room, and an incident during which Eugenio told Benoit that if he left early on a Friday, he would not be eligible to work overtime on Saturday. A written summary of these complaints was made, and TMC began a formal inquiry into the matter.

On February 24, 1997, Benoit signed a more detailed complaint, which was sent to Drelick. Benoit additionally complained about discriminatory treatment at a meeting with

Drelick, Hansen, Heide, and Eugenio on March 3, 1997. In notes written by Heide at the meeting, Heide observed that Eugenio was a "very demanding" boss, but stated that he was also their "best supervisor when it comes to knowing what a good day's work is." Heide suggested that the real problem was not race, but Benoit's failure to appreciate the disruptive effect he caused by continually arriving at work late and leaving early. Heide further stated that Eugenio's treatment of Benoit was "not picking on him" but was "a simple expectation of department efficiency."

Benoit believed that his treatment by Eugenio only worsened after making these complaints. On February 17, 1998, Eugenio ordered Benoit to clean up a mess another employee had left in the workroom. Benoit told Eugenio that the mess was not his, but Eugenio insisted that Benoit clean it anyway. Hansen later discussed this incident with Benoit on the assembly floor, stating: "If I drop this cup of coffee on the ground, and ask you to come and clean it up, you just have to do it." Hansen then approached Benoit and told him that if he didn't get off the shop floor, he could "get hurt." Benoit interpreted Hansen's demeanor as threatening. Although there is no record of any formal complaint, Benoit states that he reported this incident to Heide, and shortly afterwards was approached by Hansen, who told him never to discuss the incident with anyone again. Benoit also stated that Hansen apologized for his behavior after the incident.

C.    Physical Effects of Employment

Benoit's job was physically demanding.  Benoit and his co-workers often had to move tables measuring up to twenty feet long and weighing up to 2000 pounds.  Benoit began complaining orally to Eugenio about back pain in 1994.  He suggested that TMC install "simple stands" to take the pressure off his back when crating and packaging tables.  At least one other department at TMC used stands similar to those Benoit was requesting, but in Benoit's department, TMC supplied a forklift, which was rarely used because it was quite time consuming to operate.  In 1996, TMC also made a pulley available for assistance with lifting.  Other than the addition of the pulley, which was made available independent of any requests by Benoit, no accommodation was made.

Benoit did not see a doctor regarding his back pain until March 26, 1998.  The day before his doctor's appointment, on March 25, 1998, Benoit's hand slipped off a table and he twisted his back.  He immediately reported the injury to Eugenio.  The next day, Benoit went to his previously scheduled appointment, where he told the doctor that his back pain had begun about six weeks after he began working for TMC, and had steadily worsened.  The doctor diagnosed "low back strain and strain of the knees with possible early osteoarthritis."  He further explained that some of the pain was caused by "improper lifting techniques," and that a major contributing factor may have been the fact that Benoit had "gained

20 pounds over the last 10 years." The doctor did not prescribe any drug treatment for the pain, nor did he give Benoit any instructions to limit himself to light duty at work. He did, however, schedule Benoit for further tests, and he suggested that Benoit talk to his employer about the problem.

Benoit returned to work on Friday, March 27, 1998, and told Hansen about his recent work injury and doctor's visit. Benoit did not have a similarly detailed conversation with Eugenio. Benoit was subsequently put to work as a "grinder," grinding the tops and edges of the tables in preparation for finishing. Although the duties of a grinder require no bending and are less strenuous than those of a finisher, Hansen denies having officially put Benoit on light duty. Benoit had worked as a grinder on previous occasions, despite the fact that grinding was not part of his job description.

Benoit continued to work as a grinder on the following Monday, March 30, 1998. At the end of the day, Hansen met with Benoit and told him that he had been fired. He did not give Benoit any reason for his termination other than, "I have to let you go." Although Hansen informed Benoit of his termination, it is undisputed that Drelick alone made the decision to fire Benoit. Drelick had no knowledge of Benoit's recent injury or longstanding back problems when she made this decision.

## II.	PROCEDURAL BACKGROUND

Approximately two months after his termination, on May 5, 1998, Benoit filed a Charge of Discrimination against TMC with the Massachusetts Commission Against Discrimination ("MCAD"), alleging discrimination and "reprisal."  In response, TMC filed an MCAD Position Statement dated July 23, 1998, stating that Benoit was not discriminated against, but was fired for "repeated refusal to perform his job duties and repeated failure to meet performance standards."

On February 8, 2000, Benoit filed this action, claiming that (1) TMC discriminated against him on the basis of his race, national origin, or color in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e ("Title VII") and Mass. Gen. Laws ch. 151B ("Chapter 151B"); (2) TMC unlawfully retaliated against him for his complaints about his treatment based on race, national origin, or color in violation of Title VII; (3) TMC discriminated against him on the basis of his disability in violation of Title IX of the Americans with Disabilities Act, 42 U.S.C. § 12102 ("ADA") and Chapter 151B; (4) TMC retaliated against him in violation of the ADA; and (5) TMC retaliated against him in violation of Mass. Gen. Laws ch. 152, § 75B, the Commonwealth's workers' compensation act ("Workers' Compensation Act").

The defendants moved for summary judgment, arguing that there was insufficient evidence to support Benoit's claims.  In

granting the motion, the District Court concluded that Benoit had failed to establish a prima facie case of discrimination based on disability and retaliation, and that Benoit had failed to provide sufficient evidence to show that TMC's stated reason for his termination was a pretext for racial discrimination. This appeal followed.

## III. LEGAL ANALYSIS

### A. Summary Judgment Standard

We review summary judgment rulings de novo, construing the record evidence in the light most favorable to the nonmoving party. Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001); Feliciano De La Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000). Summary judgment is appropriate when "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue," summary judgment is appropriate if the non-moving party rests "merely upon conclusory allegations, improbable inferences, and unsupported speculation." Feliciano, 218 F.3d at 5 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990))(internal quotations omitted).

### B. Discrimination Under Title VII and Chapter 151B

Benoit first contends that the district court erred in awarding TMC summary judgment on his discrimination claims. Where,

-10-

as here, there is no direct evidence of discrimination,[1] we apply the well-established <u>McDonnell Douglas-Burdine-Hicks</u> burden-shifting framework. <u>See</u> <u>Straughn</u>, 250 F.3d at 33; <u>Feliciano</u>, 218 F.3d at 5; <u>see also</u> <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792, 804-05 (1973); <u>Texas Dep't of Cmty. Affairs</u> v. <u>Burdine</u>, 450 U.S. 248, 256 (1981); <u>St. Mary's Honor Ctr.</u> v. <u>Hicks</u>, 509 U.S. 502, 511 (1993). Although created for use in Title VII cases, this framework is also applied when evaluating discrimination claims under Chapter 151B. <u>Mullin</u> v. <u>Raytheon Co.</u>, 164 F.3d 696, 699 (1st Cir. 1999); <u>see also</u> <u>Lewis</u> v. <u>City of Boston</u>, 321 F.3d 207, 213-14 (1st Cir. 2003)(employing the framework in analyzing a discrimination claim under Chapter 151B). Under this rubric, Benoit carries the initial burden of establishing a <u>prima</u> <u>facie</u> case of discrimination. <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802.

To establish a <u>prima</u> <u>facie</u> case of racial discrimination, Benoit must show that (1) he belonged to a protected class, a racial minority; (2) he was performing his job at a level that rules out the possibility that he was fired for job performance; (3) he suffered an adverse job action by his employer; and (4) his employer sought a replacement for him with roughly equivalent qualifications. <u>Smith</u> v. <u>Stratus Computer, Inc.</u>, 40 F.3d 11, 15 (1st Cir. 1994); <u>see also</u> <u>Hicks</u>, 509 U.S. at 506; <u>McDonnell Douglas</u>, 411 U.S. at 802. This initial burden is not an onerous

[1] No TMC manager or employee is alleged to have made any explicit reference to Benoit's race, national origin, or color.

-11-

one, Burdine, 450 U.S. at 253, and we shall assume arguendo that Benoit has satisfied it.[2]

Having made this assumption, we take the second step in our inquiry: whether TMC has articulated "a legitimate, non-discriminatory reason for its adverse employment action." Straughn, 250 F.3d at 33 (citing McDonnell Douglas, 411 U.S. at 802). TMC claims that it discharged Benoit because of his persistent tardiness and frequent absences, and because of his unwillingness to work cooperatively with his supervisor. This explanation satisfies TMC's burden of providing a non-discriminatory reason for its conduct.

"Where, as here, the employer proffers a nondiscriminatory reason for its action, the burden shifts back to the plaintiff to show that the reason was a coverup for a

_____

[2] As a black Haitian, Benoit was a member of a protected class. He was good at his job, a fact that was recognized by a number of TMC managers, from his immediate supervisors to the owner of TMC. He received satisfactory or above-satisfactory ratings in every one of his performance evaluations, and it was clear that when Benoit was at work, he was an asset to the company. Benoit was fired on March 30, 1998, the quintessential "adverse job action." TMC did not hire a new employee to fill Benoit's position, but instead shifted his job responsibilities to his co-workers. TMC has admitted that other, non-black, employees performed Benoit's job after his discharge.

Of course, Benoit's tardiness and absenteeism could be taken to undermine any finding that he was performing his job adequately. But because TMC has identified these factors in providing a non-discriminatory explanation for Benoit's termination, we will assess the correctness of the district court's summary judgment ruling by analyzing whether a jury could find TMC's explanation to be a pretext masking discrimination.

-12-

discriminatory decision." Straughn, 250 F.3d at 34 (internal quotations omitted). In assessing pretext, the court must look at the total package of proof offered by the plaintiff. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991).

Here, Benoit has not provided sufficient evidence for a jury to disbelieve TMC's stated reasons for termination, let alone that those reasons masked racial discrimination. Benoit has not shown that any other similarly situated employee was treated differently. Cf. Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)(holding that the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them for it). Nor has he established that TMC failed to fire other employees despite habitual or frequent absences, tardiness, or conflicts with their supervisors. To the contrary, the record shows that TMC discharged seven employees for excessive absenteeism between 1995 and 1999, five of whom were white.

It is true that Benoit's attendance improved somewhat during the last six months of his employment. But one performance review stating that Benoit's attendance was "better" but "still needs improvement" is insufficient to create a trialworthy issue as to pretext, especially since attendance issues were not the only reasons given by TMC for firing Benoit. In any event, Benoit was

-13-

late or absent during eight out of his last twelve weeks of work. No rational factfinder could find for Benoit on the pretext evidence that has been adduced. Cf. Byrd v. Ronayne, 61 F.3d 1026, 1032 (1st Cir. 1995)(deeming insufficient plaintiff's evidence of one favorable performance review 15 months prior to termination, mixed performance evaluations later in that year, and two performance bonuses).

C.    Retaliation Under Title VII

Benoit next argues that the district court erred in awarding TMC summary judgment on his claim that he was discharged in retaliation for engaging in conduct protected by Title VII. As a matter of law, Benoit's retaliation claim may be viable even if the underlying discrimination claim is not. Mesnick, 950 F.3d at 827 (citing Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 33 (1st Cir. 1990)). Moreover, the employment activity or practice that Benoit opposed need not be a Title VII violation so long as Benoit had a reasonable belief that it was, and he communicated that belief to his employer in good faith. Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261-62 (1st Cir. 1999).

To establish his prima facie case of retaliation under 42 U.S.C. § 2000e-3(a), Benoit must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action after or contemporaneous with such activity; and (3) there existed a causal link between the protected activity and the adverse job

-14-

action.  Wyatt v. City of Boston, 35 F.3d 13, 15 (1st Cir. 1994).

Benoit has failed to establish a trialworthy issue as to the last

of these three elements.

Although Benoit engaged in protected activity when he

complained to his supervisors about perceived racial

discrimination, Higgins, 194 F.3d at 262, and was terminated

subsequent to the complaints, there is insufficient evidence for a

jury to find that the two were causally related.  Benoit complained

about race and national origin discrimination to Hansen on February

18, 1997, and again in a formal meeting with Drelick, Hansen,

Heide, and Eugenio on March 3, 1997.  He was discharged more than

one year later, on March 30, 1998.  As this is the sum and

substance of his retaliation evidence, it is insufficient to

forestall summary judgment.  See Dressler v. Daniel, 315 F.3d 75,

80 (1st Cir. 2003)("[T]he inference of a causal connection becomes

more tenuous with time."); Mesnick, 950 F.2d at 828 (observing that

a nine-month period between the protected conduct and adverse

action suggested the absence of any causal connection).

D.     Discrimination Under ADA and Chapter 151B

Benoit next argues that the district court erred in

granting TMC summary judgment on his disability discrimination

claims.  To prevail on such a claim under the ADA or its

Massachusetts analogue, Chapter 151B, Benoit must establish that he

(1) suffered from a disability as defined by the statutes; (2) was

-15-

otherwise qualified to perform the essential functions of his employment with or without reasonable accommodation; and (3) was subject to an adverse employment action. Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002). Benoit fails to satisfy the first element.

In order to be considered "disabled" or "handicapped" under the statutes, Benoit must demonstrate a physical or mental impairment that substantially limited one or more of his major life activities. 42 U.S.C. § 12102(2)(A); Mass. Gen. Laws ch. 151B, § 1(17); See Carroll, 294 F.3d at 237 n.3 (stating that, with some exceptions, the definitions of "disability" under the federal law are virtually identical to the definitions of "handicap" under Massachusetts law, and as such the state has looked to federal case law in interpreting the statute).[3]

The Supreme Court has held that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002). A "substantial" limitation cannot include any impairment which interferes "in only a minor way with the performance of manual tasks," and the phrase "major life activities" refers to only those activities which are of "central

---

[3]Although there are instances in which Massachusetts law diverges from the ADA, no such distinctions are at issue or were argued in this case, and we accordingly dispose of the state and federal claims together. See Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C., 258 F.3d 30, 32 n.1 (1st Cir. 2001).

-16-

importance to daily life." Id. The impact of the impairment must also be permanent or long term. Id. at 198; Katz v. City Metal Co., Inc., 87 F.3d 26, 30-31 (1st Cir. 1996).

Benoit complained of back pain beginning in late 1991, but the injury was insufficiently severe to merit a doctor's appointment until March 26, 1998. After his first doctor's appointment, Benoit was diagnosed as having "low back strain" and a "strain of the knees." The doctor added that the cause of these strains could have been "improper lifting techniques" or the fact that Benoit had gained weight. A follow-up visit on March 31, 1998, revealed that Benoit had back and shoulder sprains. The subsequent medical reports indicate that Benoit had a physical impairment.

This impairment, however, does not rise to the level of "disability" or "handicap" as defined by the statutes, because no "major life activity" was impaired. Benoit claims that he was substantially limited in the major life activity of working. However, the "inability to perform a single, particular job" does not constitute the required substantial limitation. Lebron-Torres v. Whitehall Labs., 251 F.3d 236, 240 (1st Cir. 2001)(citing 29 C.F.R. § 1630.2(j)(3)(i)). The only activity that Benoit was advised by his doctor to avoid was "heavy lifting," and Benoit has not demonstrated that this precluded him from working in a substantial class or broad range of jobs. Id. Benoit had

-17-

continued working as a finisher throughout the years despite his complaints of back pain, and returned to work as a grinder the day after his doctor's appointment.

Further, there is no indication that the impairment was permanent or long term. Benoit's medical records indicate that the impairment was temporary, and the treatment for the injury was limited to a prescription for anti-inflammatory drugs and pain relievers. Benoit did not seek further medical attention for his injury until after a little more than a month had passed, and he did not indicate to any subsequent employers or prospective employers that he had any physical restrictions.

Benoit alternatively contends that TMC "regarded" him as disabled. Thus, he argues, he should be protected, as someone who "whether actually impaired or not, may be the victim[] of stereotypic assumptions, myths, and fears regarding such limitations." Dahill v. Police Dept., 748 N.E. 2d 956, 962-63 (Mass. 2001). The evidence does not support this argument. "A plaintiff claiming that he is 'regarded' as disabled cannot merely show that his employer perceived him as somehow disabled; rather, he must prove that the employer regarded him as disabled within the meaning of the ADA." Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1169 (1st Cir. 2002)(emphasis in original). Although Benoit requested simple stands to assist with lifting, he at no point indicated to TMC that he was disabled within the meaning of the

ADA. The fact that TMC assigned Benoit to the lighter work of grinding after Benoit sustained a work injury and visited a doctor shows no more than TMC's possible awareness of a temporary injury. See Champagne v. Servistar Corp., 138 F.3d 7, 14 (1st Cir. 1998)("That [defendant] voluntarily decided to [accommodate plaintiff] for a period of time does not establish that [plaintiff] was disabled or that [this] was a required reasonable accommodation."); Katz, 87 F.3d at 31 (listing examples of "impairments that are usually not disabilities because they are temporary, non-chronic, and of short duration, with little or no long term or permanent impact," including sprains)(internal quotations omitted). The evidence shows that TMC believed, at most, that Benoit was temporarily unable to meet the requirements of one particular job, that of "finishing." This is not enough. See Bailey, 306 F.3d at 1170.

E.    Retaliation Under the ADA and Workers' Compensation Act

Finally, Benoit argues that the district court erred in granting TMC summary judgment on his claims of retaliation under the ADA and Workers' Compensation Act. We evaluate each of these arguments in turn.

Under the ADA, as with claims of retaliation under Title VII, Benoit must establish that (1) he engaged in protected conduct, (2) he suffered adverse employment action, and (3) there was a causal connection between his conduct and the adverse action.

Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997). As Benoit's claims of retaliation under Title VII failed on the third element, so too do his claims of retaliation based on disability.[4]

We have previously stated that it is "questionable" whether a plaintiff who merely requests an accommodation fits within the literal language of 42 U.S.C. § 12203(a). Soileau, 105 F.3d at 16. At the same time, we observed that "it would seem anomalous . . . to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge." Id. Accordingly, as in Soileau, we shall assume arguendo that such behavior on the part of a plaintiff brings him within the ambit of 42 U.S.C. § 12203(a). See id.

Benoit has established that he complained about his injuries to his superiors at TMC. He complained to Eugenio when he requested simple stands, when he informed Eugenio of the injury he sustained at work on March 25, 1998, and again when he complained to Hansen on March 27, 1998, the day after his doctor's appointment. Benoit has further established that he was fired the

---

[4] The ADA's prohibition against retaliation and coercion states: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

next working day after his last complaint, on Monday, March 30, 1998. However, it is undisputed that Drelick was solely responsible for the decision to fire Benoit, and that Drelick was unaware of Benoit's injury and recent doctor's appointment at the time of that decision. Thus, no reasonable factfinder could conclude that TMC retaliated against Benoit for complaining about his impairment.

These same facts underlie Benoit's failure to establish a trialworthy issue as to retaliation under the Workers' Compensation Act.[5] Drelick fired Benoit without any knowledge of his injury, let alone any knowledge that Benoit might avail himself of his rights under the Workers' Compensation Act. As such, Benoit's final claim of retaliation fails.

## IV.    CONCLUSION

For the reasons stated above, the judgment of the district court is **affirmed**.

---

[5] Under the Workers' Compensation Act, Benoit must demonstrate that (1) he engaged in an activity protected by the Workers' Compensation Act; (2) TMC was aware of the protected activity; (3) TMC thereafter engaged in an adverse employment action; and (4) but for his engagement in the protected activity, TMC would not have taken the adverse employment action against Benoit. Fallon v. Federal Express Corp., Inc., No. 200000367, 2002 WL 31677216, at *6 (Mass. Super. Oct. 11, 2002).