**Randall OAKSTONE, Plaintiff,**

v.

**POSTMASTER GENERAL, Defendant.**

No. CV–03–164–B–W.

United States District Court,
D. Maine.

Aug. 18, 2004.

---

Frank T. McGuire, Rudman & Winchell, Bangor, ME, for Randall S Oakstone, Plaintiff.

Evan J. Roth, Office of the U.S. Attorney, District of Maine, Portland, ME, for Postmaster General, Defendant.

## ORDER ON DEFENDANT POSTMASTER GENERAL'S MOTION FOR SUMMARY JUDGMENT

WOODCOCK, District Judge.

Claiming sex discrimination, sexual harassment, and retaliation, Randall Oakstone has filed a civil rights action under Title VII against the Postmaster. General. Mr. Oakstone claims the Postal Service, uncritically accepting demonstrably false allegations of physical abuse, has taken sides in favor of a female non-supervisory co-employee against him by reassigning, harassing, and demoting him. This Court denies the Postal Service's Motion for Summary Judgment. There are factual questions as to whether in lodging a false complaint of male on female physical abuse, Ms. Philbrook, a co-worker, engaged in an act of impermissible gender bias under Title VII and whether the Postal Service in undertaking tangible employment actions against him despite knowing these charges were false, should be held responsible as his employer under Title VII.

### I. Statement of Facts.[1]

Randall Oakstone and Ramona Philbrook were lovers. From July 1, 1994 to

---

1. Consistent with the "conventional summary judgment praxis," the Court recounts the

April 1, 1997, Mr. Oakstone and Ms. Philbrook were inseparable and contemplated marriage. On April 1, 1997, for reasons both immaterial and complex, Mr. Oakstone decided to break off the relationship. The break was not clean. Ms. Philbrook initially refused to accept the fact the relationship had ended. In April and May 1997, she repeatedly attempted to convince him to reconsider.

Mr. Oakstone and Ms. Philbrook were also employees of the United States Postal Service; each worked at the Hampden Maine Distribution Center. Some time in late April or early May 1997, Ms. Philbrook presented Mr. Oakstone with an ultimatum: she demanded they discuss the conflict in their relationship. Mr. Oakstone refused, saying there was no more relationship to discuss. When Mr. Oakstone punched out of work that day, Ms. Philbrook confronted him in the parking lot. She followed Mr. Oakstone as he walked to his truck and demanded they discuss their personal issues. When he refused, she hung onto him and went limp in an effort to prevent him from entering his vehicle. He did not touch Ms. Philbrook, but responded loudly.[2]

The hubbub attracted the attention of postal supervisors, who asked them if they needed assistance. They both responded "No," and explained it was a personal matter. They tried EAP counseling, which was unsuccessful, and in late May 1997, Mr. Oakstone began to see other women. When Ms. Philbrook found out, she cooled considerably and since June 1997, they have not spoken. They have not work together either. In December 1998, Mr. Oakstone became engaged to his current wife.[3]

In February 1999, a fill-in position as an inside and outside expediter opened up and Mr. Oakstone expressed an interest in the position. Carolyn Smith, the supervisor, assigned Mr. Oakstone to train as a fill-in inside and outside expediter, positions requiring a close working relationship with Ms. Philbrook.[4] The expediter

facts in a light most favorable to Mr. Oakstone's theory of the case, consistent with record support. *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 16 (1st Cir.2002). The Court has relied either on the uncontested facts or on Mr. Oakstone's version, if contested.

2. Although not in the Statements of Material Fact, during his deposition, Mr. Oakstone provided some further background. He related that numerous times during their relationship, Ms. Philbrook had told him about an incident with her former husband. They had been arguing and Ms. Philbrook attempted to "make the conflict a physical one". Her husband held her back at arm's length and in so doing, bruised her arms. The police were called and her husband was arrested for spousal abuse. *Oakstone Dep.* at 25–26. This background helps explain Mr. Oakstone's reaction to Ms. Philbrook in the parking lot. He testified he was "very afraid and wanted to get into the safety and security of my truck." *Id.* at 30.

It also buttresses Mr. Oakstone's theory that in making the allegation of male on female physical abuse, Ms. Philbrook had engaged in an act of gender based harassment, since she had with impunity previously provoked her ex-husband to his detriment, had repeatedly reiterated the story to Mr. Oakstone, and cynically lodged this allegation confident due to gender stereotyping, her employer would take her part. Despite its potential probative value, Mr. Oakstone did not include this evidence in his Statement of Material Facts and this Court, in fairness to the Postal Service, has not considered it in arriving at its decision. Without this evidence, the issue becomes closer, but Mr. Oakstone has still generated genuine issues of material fact.

3. They were married in May 1999.

4. Ms. Philbrook was an outside expediter. If Mr. Oakstone worked as an inside expediter, they would not be in physical proximity, but would be in constant contact through a walkie-talkie.

positions provided Mr. Oakstone with additional overtime opportunities and a Level 6 pay rate, higher than his regular Level 5 rate.

Ms. Philbrook spoke up. She went to Ms. Smith and protested Mr. Oakstone's assignment. She informed her of their past intimacy. She also claimed he had been abusive, specifically referring to the parking lot incident. She asserted he had physically assaulted her, pushed her down and dragged her across the lot; she said she was afraid of him. As noted, these allegations were false. She went on to say that Mr. Oakstone had requested the assignment to antagonize her, that he had deliberately hung around her at work to make her uncomfortable, that he was manipulative, and that, if given the opportunity, he would antagonize her on the walkie-talkie they were required to use at work. She demanded Mr. Oakstone not be allowed to train as an expediter and not be allowed to work with her. Ms. Philbrook's allegations against Mr. Oakstone were not merely untrue, but were acts of retaliation against him for having broken off their relationship.

In response, in February 1999, under the postal service's zero tolerance policy, Ms. Smith suspended Mr. Oakstone's training and investigated the allegations.[5] She was unable to substantiate Ms. Philbrook's allegations against Mr. Oakstone. At about the same time, Mr. Oakstone and another co-employee complained Ms. Philbrook had a gun on postal premises. Under the same zero tolerance policy, Ms. Smith placed Ms. Philbrook on administrative leave while she investigated the allegation; she could not substantiate that complaint either.

Following these investigations, in an effort to compromise, Ms. Smith attempted

through scheduling, to allow Mr. Oakstone the higher level opportunity while at the same time avoiding undue stress for Ms. Philbrook. On March 17, 1999, "Back-up/Assist Platform Expediter on Sunday" was officially added to Mr. Oakstone's job description. On March 20, 1999, Ms. Smith stopped supervising both Mr. Oakstone and Ms. Philbrook, and the new supervisor assigned was Jeff Clark.

From late March 1999, when Mr. Clark took over, to the present, the Postal Service has systematically deprived Mr. Oakstone of expediter training and work. The basis for its denial of the expediter opportunity to Mr. Oakstone has been the Postal Service's uncritical acceptance of Ms. Philbrook's repeated allegation that she is unable to work with him, because of a past abusive relationship. The Postal Service has gone to unusual lengths to prevent Mr. Oakstone from performing expeditor duties, including having supervisors perform the work, letting untrained junior employees perform the duties, recruiting and training younger female employees to perform the job, and even leaving the position vacant.

Further, due to Ms. Philbrook's false allegations and Mr. Oakstone's own complaints about them, management at the Postal Service adopted a negative attitude against Mr. Oakstone. They singled Mr. Oakstone out by imposing movement restrictions on him from some time in 1999 to April 2000. They changed his duties in unusual and negative ways, informed him he had an abusive relationship with Ms. Philbrook, denied him work and overtime opportunities, monitored and limited his breaks, and gave him more work and less time to complete it than other employees. In an effort to entrap Mr. Oakstone, Mr.

---

5. There is a contradiction between the testimony of Carolyn Smith and Mr. Oakstone on whether Ms. Philbrook's complaint was treated as a "zero tolerance" complaint.

Clark placed $30 in U.S. currency on the work area floor in Mr. Oakstone's work area in hopes he would pick up the money and be subject to discharge. When another employee picked up the money, Mr. Clark immediately claimed it. This action violated Postal Service procedures and regulations.

In late February 2000, following a labor-management meeting in which Mr. Oakstone's complaint was discussed, Mr. Oakstone was informed that the Postal Service was eliminating his job. The elimination of his job was officially announced on March 11, 2000, to be effective May 2000. On May 19, 2000, in direct retaliation for his complaints, Mr. Oakstone's manual racks job was eliminated. Other employees were assigned his manual racks duties. In June 2000, Mr. Oakstone was reassigned to a Level 4 job in Automation at a lower rate of pay and at a loss of regular time and overtime opportunities.

Finally, Postal Service management has allowed Ms. Philbrook to deny Mr. Oakstone participation in common employee activities and to retaliate against employees she perceives are friendly with Mr. Oakstone. For example, Ms. Philbrook controlled the "coffee list," a list of employees who contributed to a pool of money for coffee. She refused to add Mr. Oakstone to the list and when co-employees signed up for him under their names, she excluded them as well. The Postal Service acknowledges that Ms. Philbrook has a very intense and emotional personality and its decision not to assign Mr. Oakstone to the inside expediter position was to avoid placing undue stress on Ms. Philbrook by requiring them to communicate by walkie-talkie. Postal Service Supervisor Wally Smyth said that Ms. Philbrook had management "over a barrel" and he was handling Mr. Oakstone's work assignments differently due to her allegations.

Mr. Oakstone has repeatedly complained to management that Ms. Philbrook's allegations are false and should not be used as a basis for denial of job opportunities and mistreatment. However, the Postal Service has handled Mr. Oakstone's situation differently than they have addressed similar complaints by female employees. Despite Mr. Oakstone's requests, the Postal Service has never investigated his complaints or taken any corrective action to address them. Complaints by female employees of harassment by male co-workers are promptly investigated and acted upon.

Postal Service standard practice when an employee complains of sexual harassment or retaliation by a co-employee, is to perform a prompt investigation. If the investigation confirms the inappropriate conduct, the standard practice is for the Postal Service to instruct both workers to leave their personal relationship at the door and to treat one another civilly. The Postal Service recognizes its obligation to make certain that any work place harassment or retaliation from a failed romance cease and to take prompt and effective corrective action to assure the conduct stops. The Postal Service in this case, however, failed to follow its standard practice and instead, treated Ms. Philbrook's false allegations as true and retaliated against Mr. Oakstone by affecting the terms and conditions of his employment.

As a consequence of the Postal Service's acceptance of Ms. Philbrook's unfounded allegations, Mr. Oakstone has suffered loss of overtime expediter work opportunities, loss of expediter work opportunities at a pay rate higher than his usual rate, loss of regular pay and benefits, loss of overtime pay and benefits, job elimination, and demotion. He has also suffered non-economic consequences, including loss of enjoyment of life and stress.

## II. Discussion.

### A. Standard For Review.

The Postal Service filed a motion to dismiss or in the alternative a motion for summary judgment.[6] The moving party is entitled to a summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The First Circuit has defined "material" to mean "a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the· nonmovant." *McCarthy v. Northwest Airlines, Inc.* 56 F.3d 313, 315 (1st Cir.1995). It has defined "genuine" as "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* The moving party must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The trial court is obligated to view the entire record "in the light most hospitable to the nonmovant" and indulge "all reasonable inferences in that party's favor." *Cadle Co. v. Hayes,* 116 F.3d 957, 959 (1st Cir.1997); *see also Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). This Court has stated, however, that in discrimination actions, "caution is appropriate when considering summary judgment for an employer." *Bilodeau v. Mega Indus.,* 50 F.Supp.2d 27, 44 (D.Me.1999).

### B. Title VII: 42 U.S.C. § 2000e.

42 U.S.C. § 2000e provides that an employer may not "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." [7] Title VII makes it illegal for an employer to discriminate against an employee on the basis of sex, to create a hostile working environment on the basis of sex, or to retaliate against the employee for making a charge of discrimination. 42 U.S.C. §§ 2000e–2, 3(a).

### C. Retaliation.

This Court can quickly dispose of the Postal Service's motions on the retaliation theory. Other than the blanket statement that "Mr. Oakstone has not alleged sufficient facts to establish the causation element of any other claim under Title VII, such as ... retaliation," the Postal Service has failed to address his retaliation claim in either its initial or reply memorandum.

■ To make out a *prima facie* case of retaliation under 42 U.S.C. § 2000e–3(a), an employee must show: (1) he engaged in protected activity; (2) he suffered adverse employment action after or contemporaneous with such activity; and, (3) there existed a causal link between the protected activity and the adverse job action. *Che v. Mass. Bay Transp. Auth.,* 342 F.3d 31, 38 (1st Cir.2003); *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 175 (1st Cir.2003); *Wyatt v. City of Boston,* 35 F.3d 13, 15 (1st Cir.1994). As a matter of law, Mr. Oakstone's retaliation claim may be viable even if the underlying discrimina-

---

**6.** Under Rule 11(b), because the resolution of the motion depends upon the consideration of matters outside the pleadings, the parties and the Court have treated the matter as a motion for summary judgment. Fed.R.Civ.P. 11(b).

**7.** Mr. Oakstone also invokes the provisions of 42 U.S.C. § 1981a, which provides for rights

of recovery for violation of 42 U.S.C. § 2000e–16. § 2000e–16 prohibits discrimination on the basis of sex in federal government employment, including specifically the United States Postal Service. 42 U.S.C. § 2000e–16(a).

tion claim is not. *Benoit*, 331 F.3d at 174; *Mesnick v. General Electric*, 950 F.2d 816, 827 (1st Cir.1991); *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 33 (1st Cir. 1990). The employment activity or practice that Mr. Oakstone opposed need not be a Title VII violation so long as Oakstone had a reasonable belief that it was and he communicated that belief to his employer in good faith. *Benoit*, 331 F.3d at 174–75; *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261–62 (1st Cir.1999).

■ The record confirms that Mr. Oakstone engaged in protected activity. Beginning March 1999, he repeatedly complained to management that Ms. Philbrook was improperly and unlawfully blocking his training and his work as an expediter in retaliation for his declining her sexual advances and breaking off their romantic relationship. He asserted to management that her actions and its responses violated his Equal Employment Opportunity rights.[8]

The record also confirms that the Postal Service took "adverse employment action"

against Mr. Oakstone. The First Circuit has defined "adverse employment action" as including a variety of conduct, including "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Hernandez–Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998). Mr. Oakstone has satisfied this criterion.

The last element is a causal link between the protected activity and the adverse job action. In *Mesnick*, the First Circuit described the evidence that may be relevant for determining whether causation exists: (1) differential treatment in the workplace [9]; (2) temporal proximity [10]; (3) statistical evidence; and, (4) comments by the employer that intimate a retaliatory mindset.[11] *Mesnick*, 950 F.2d at 828. Mr. Oakstone has produced circumstantial evidence of differential treatment, temporal proximity, and comments indicative of a retaliatory mindset. He has not produced statistical evidence.

---

**8.** In March 1999, Mr. Oakstone filed an informal administrative complaint of discrimination. In July 1999, he participated in a mediation session with officials from the Postal Service. On August 30, 1999, he filed a formal complaint of discrimination. On October 25, 2000, union officials met with Mr. Oakstone's supervisor, Jeff Clark, regarding Mr. Oakstone's repeated requests for expediter training and the possibility of legal action was discussed. In February 2000, Mr. Oakstone's request for expediter training was again discussed during a labor-management meeting. In March 2000, Mr. Oakstone filed a second informal complaint of discrimination. In April 2000, he participated in an informal mediation regarding his second informal complaint. On May 30, 2000, Mr. Oakstone filed a second formal complaint of discrimination.

**9.** The differential treatment includes: (1) being singled out for movement restrictions at

work; (2) being subjected to monitoring; (3) being treated by management in an unfriendly and hostile manner; (4) being the only employee to have his position eliminated; and, (5) refusing to allow him to train into and work in the expediter job.

**10.** Mr. Oakstone's examples include: (1) an October 25, 1999 union-management meeting at which his complaints were raised and Mr. Clark's decision on October 27, 1999 to flood him with 2½ additional tons of work and to personally monitor his work efforts; and, (2) a February 23, 2000 union-management meeting at which his complaints were aired and a decision shortly thereafter to eliminate his job.

**11.** There is no direct evidence of comments by management that confirm its actions were taken in retaliation for his filing of complaints as opposed to its perception that he had abused Ms. Philbrook.

Under the familiar burden shifting analysis mandated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Mr. Oakstone has sustained his burden to establish a *prima facie* case of retaliation. Under *McDonnell Douglas*, the burden then shifts to the Postal Service to articulate a legitimate, non-discriminatory reason for its actions. Because the Postal Service did not brief this issue, the Court can only speculate why it contends there were such reasons. Although the Postal Service, in making its other arguments, has stated Mr. Oakstone was not singled out for job elimination, it has failed to respond to Mr. Oakstone's other points. Accordingly, this Court finds that the Postal Service has not sustained its burden of production on the retaliation issue and, therefore, denies its motion to dismiss and motion for summary judgment on this part of Mr. Oakstone's claim.

### D. Sexual Harassment.

#### 1. Gender–Based Harassment.

In its motion, the Postal Service contends it is entitled to judgment, since the gravamen of Mr. Oakstone's sexual harassment complaint is not sex discrimination, but the spiteful retribution of a former lover.[12] The Postal Service argues Ms. Philbrook's retaliation against Mr. Oakstone is not because he is male; it is because she feels jilted. The Postal Service cites a number of cases that have ruled against claims arising out of failed office romances. *Taken v. Oklahoma Corp. Comm'n*, 125 F.3d 1366, 1368 (10th Cir. 1997); *Huebschen v. Dep't of Health & Social Serv.*, 716 F.2d 1167, 1168 (7th Cir. 1983); *Kahn v. Objective Solutions, Intl.*, 86 F.Supp.2d 377, 379 (S.D.N.Y.2000); *Keppler v. Hinsdale Township High School*, 715 F.Supp. 862, 864 (N.D.Ill.1989); *Freeman v. Cont'l Technical Servs., Inc.*, 710 F.Supp. 328, 329 (N.D.Ga.1988).[13]

The seminal case is *Huebschen*. In *Huebschen*, the Seventh Circuit addressed a claim by an employee that his female supervisor had terminated his probation after he had spurned her sexual advances. *Huebschen*, 716 F.2d at 1168–69. The *Huebschen* case did not involve Title VII.[14] *Huebschen's* analysis was confined to the plaintiff's argument that the supervisor's

---

**12.** For analytic purposes, sexual harassment has generally been categorized either as *quid pro quo* harassment or hostile work environment harassment. *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 897–98 (1st Cir.1988). To make out a *prima facie* case of *quid pro quo* harassment, a plaintiff must establish: (1) that she was subject to unwelcome sexual advances by a supervisor; and, (2) that her reaction to these advances affected tangible aspects of her compensation, terms, conditions or privileges of employment. *Id.* at 898. To prove a claim of hostile work environment sexual harassment, a plaintiff must establish: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon her sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5)

that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and, (6) that some basis for employer liability has been established. *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 395 (1st Cir.2002)(quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir.2001)). The Postal Service bases its motion on the limited points addressed in this opinion.

**13.** There are more. *See, e.g., Poe v. Haydon*, 853 F.2d 418, 429 n. 6 (6th Cir.1988); *Succar v. Dade County Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir.2000).

**14.** The employee had elected to sue both his employer and his supervisor under 42 U.S.C. § 1983, using the asserted violation of Title VII as a basis for claiming a § 1983 "depriva-

actions constituted a violation of the Equal Protection Clause. Although gender discrimination can provide a basis for an equal protection claim, *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), *Huebschen* found that the supervisor's discrimination was not based on gender, but on "the group of persons with whom [she] had or sought to have a romantic affair." *Id.* at 1172. *Huebschen* was not "persuaded that the Equal Protection Clause should protect such a class." *Id.*

The *Huebschen* holding is an intriguing and counterintuitive result.[15] The attempt is to draw a bright line between Title VII cases, prohibiting discrimination due to gender, and other cases of inappropriate, even mean spirited employment actions, generated by personal animosity, but not related to gender bias. *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir.1986) (noting "personal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII"). The line dims when the reason for personal animosity is past sexual rejection. In the instant case, there is no sign that Ms. Philbrook wished to reinitiate her romance with Mr. Oakstone; to the contrary, her fire had turned to ice. Instead, her motivation was fueled by the destructive power of revenge, almost two years after the breakup. Under *Huebschen*, this alone would be insufficient.

However, Ms. Philbrook's choice of weapon makes a difference. To illustrate, this Court contrasts two Eleventh Circuit decisions: *Succar v. Dade County Sch.*

*Bd.*, 229 F.3d 1343 (11th Cir.2000) and *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183 (11th Cir. 2001). In *Succar*, a male teacher was verbally and physically harassed by a female teacher after he terminated an affair. *Id.* at 1344. Maintaining that his employer, the school board, had taken insufficient steps to remedy the problem, he filed suit alleging gender discrimination, claiming a hostile work environment due to his gender. *Id.* The Eleventh Circuit, in a brief per curiam opinion, agreed with the district court's summary judgment, since Title VII is "not a shield against harsh treatment at the work place." *Id. Succar* concluded: "In other words, Lorenz's harassment of Succar was motivated not by his male gender, but rather by Lorenz's contempt for Succar following their failed relationship; Succar's gender was merely coincidental." *Id.*

By contrast, in *Lipphardt*, a female employee began dating her male supervisor. When she terminated the relationship, Mr. Knuth, the supervisor, engaged in a pattern of harassment. *Lipphardt*, 267 F.3d at 1185. He ultimately concocted an employment violation by Ms. Lipphardt and she was fired. *Id.* at 1187. In contrasting the facts in *Lipphardt* to *Succar*, the Eleventh Circuit stated that "[i]t is important that Knuth's conduct towards Lipphardt was sexual in nature, while the harassment that Succar suffered was not." *Id.* at 1188. As part of his reaction to Ms. Lipphardt's rejection, Mr. Knuth solicited her at work to reinstate their intimate relationship and

---

tion of the rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Noting that Title VII does not provide a cause of action against individuals as opposed to employers, *Huebschen* concluded that § 1983 could not be used to obtain relief not afforded by Title VII itself. *Id.* at 1170–71

**15.** Judge Young recently cast doubt on the "relevance of the reasoning underlying this opinion" in light of subsequent jurisprudence. *Perks v. Town of Huntington*, 251 F.Supp.2d 1143, 1157 n. 13 (E.D.N.Y.2003). This Court concludes, as did Judge Young in *Perks*, that even applying the *Huebschen* analysis, the result is the same.

several times brushed up against her in an inappropriate way at work. *Id.* at 1189. This was sufficient to allow a jury to conclude that Ms. Lipphardt had an objective belief that she was the victim of harassment based on her gender.[16] *Id.*

From these cases emerges a distinction: In failed romance cases, where employment harassment follows, there is a difference for Title VII purposes between non-gender based and gender-based harassment. If the means for revenge is non-gender based, it does not trigger a Title VII response; if the means is gender-based, it does. The factual distinctions can be subtle and in the words of the *Lipphardt* Court, "there is a point where inappropriate behavior crosses the line into Title VII harassment." *Lipphardt,* 267 F.3d at 1188.

■ This Court concludes there is sufficient evidence to generate a factual issue, requiring jury resolution, as to whether Ms. Philbrook's retribution crossed the line into Title VII harassment. Ms. Philbrook chose to use as her weapon a false allegation of male on female physical abuse and there is sufficient evidence in this record from which a jury could conclude

that her choice of weapon was an act of gender-based harassment.[17]

During the parking lot incident, Ms. Philbrook hung on Mr. Oakstone, placed her full body weight against him and went limp, "so that I had to stop, otherwise she'd fall." In other words, Mr. Oakstone stated that Ms. Philbrook placed herself in such a position that if he had continued to walk, she would have tipped over. Mr. Oakstone testified he was "very afraid and [he] wanted to get into the safety and security of [his] truck." Based on this description, a factfinder could find Ms. Philbrook's actions in the parking lot were an attempt to deliberately provoke Mr. Oakstone into a physical confrontation and thereby cause him trouble.

Nearly two years later, having failed to provoke a physical response from Mr. Oakstone in the parking lot, Ms. Philbrook concocted one at work. By falsely claiming Mr. Oakstone had assaulted her, that he had pushed her down, that he had dragged her across the parking lot, and that she was afraid of him, a jury could conclude that Ms. Philbrook, as a female, was making a charge against Mr. Oakstone, as a male, she knew would trigger an immediate and irreparable consequence for him, due to a stereotype about his

16. In *Lipphardt,* the jury had found against Ms. Lipphardt on the hostile work environment claim and had found for her on the Title VII retaliation claim. The contrast between *Succar* and *Lipphardt* does not depend upon which form of Title VII action is being considered, but whether the cause of action falls within the ambit of Title VII at all.

17. The female supervisor in *Perks* employed a similar tactic. After Mr. Perks had broken off their affair, she confronted him, struck him with her right hand on the left side of his head, and grabbed the left sleeve of his jacket. *Perks,* 251 F Supp.2d at 1151. When Mr. Perks grabbed her arm and attempted to release her grip, she started screaming, "You hit me. You hit me." He ran to his office

and locked himself inside. She later drove to the Town Police Office and filed an incident report for harassment against Mr. Perks. A Town commissioned independent factfinder later wrote that his investigation had "uncovered evidence, both circumstantial and direct, that casts serious doubts on Ms. Scarpati-Reilly's claims, and more significantly, serious doubts of the propriety of her actions, both before and after the alleged incident." *Id.* at 1152. Judge Young did not reach the question of whether this charge standing alone, assuming it was false, would constitute gender discrimination; he concluded there was sufficient other evidence of a hostile work environment. *Id.* at 1155.

gender.[18]

In 1986, three years after *Huebschen*, the Supreme Court decided *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), which concluded that in addition to the *"quid pro quo"* misconduct, Title VII prohibits harassment based the creation of a hostile work environment. In deciding *Meritor*, the Supreme Court relied on the EEOC Guideline 29 C.F.R. § 1604.11(a), which reads:

> [a] Harassment on the basis of sex is a violation of section 703 of title VII. *Unwelcome sexual advances*, requests for sexual favors, and other verbal or physical conduct of a sexual nature *constitute sexual harassment when* (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or *rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual*, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment.

*Id.* (emphasis added).

A direct reading of this Guideline fits Mr. Oakstone's version of the facts in this case. Ms. Philbrook made "sexual advances" to Mr. Oakstone, which were "unwelcome." He rejected those advances. His rejection of those advances precipitated Ms. Philbrook's false charges. The Postal Service used her false charges as the basis for employment decisions affecting Mr. Oakstone.

## 2. Employer Liability.

The final issue is whether the Postal Service is responsible for acting on Ms. Philbrook's vendetta. In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Supreme Court addressed the scope of employer liability for discriminatory actions of its agents. It discussed the instances where the employee has been subjected to a "tangible employment action," which it defined as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761, 118 S.Ct. 2257. The *Burlington Industries* Court stated that in those instances, because a tangible employment action "brings the official power of the enterprise to bear on the subordinates" and "requires an official act of the enterprise, a company act," it is properly attributable to the employer. *Id.* at 761–62, 118 S.Ct. 2257. In doing so, the *Burlington Industries* decision cited with approval Judge Posner's use of the term, "cat's paw" to refer to employer liability that accrues when the employer acts as the conduit of a subordinate's prejudice. *Id.* at 762, 118 S.Ct. 2257 (citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990)). *See also Gee v. Principi*, 289 F.3d 342, 346 (5th Cir.2002) (finding "when the

---

**18.** Charges of male on female physical abuse are so often believed, because the sad fact is they are so often true. The tragic history of male on female violence and the struggle of abused women to have their complaints taken seriously by the judicial system have been well documented. The Postal Service was certainly correct to take Ms. Philbrook's accusation seriously, to investigate it thoroughly, and to protect her during the investigation. Mr. Oakstone's cause of action is based on what the Postal Service has done after it concluded the charge was groundless. No policy, however laudable, justifies an employer taking tangible employment actions against an accused based on what it has concluded is a false accusation.

person conducting the final review serves as the 'cat's paw' of those who were acting from retaliatory motive, the causal link between the protected activity and adverse employment action remains intact."); *Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862, 877 (6th Cir.2001); *Willis v. Marion County Auditor's Office,* 118 F.3d 542, 547 (7th Cir.1997) (noting "there can be situations in which the forbidden motive of a subordinate employee can be imputed to the employer because, under the circumstances of the case, the employer simply acted as the 'cat's paw' of the subordinate."); *Kramer v. Logan County Sch. Dist. No. R–1,* 157 F.3d 620, 624 (8th Cir.1998); *English v. Colo. Dep't of Corr.,* 248 F.3d 1002, 1011 (10th Cir.2001); *Llampallas v. Mini–Circuits, Inc.,* 163 F.3d 1236, 1249 (11th Cir.1998); *Griffin v. Washington Convention Ctr.,* 142 F.3d 1308 (D.C.Cir.1998).

 In this case, the Postal Service cannot immunize itself from the misinformation supplied by its employee, even though the employee was not Mr. Oakstone's supervisor. The reason is, according the Mr. Oakstone, the supervisors took Ms. Philbrook's part in her vindictive campaign against Mr. Oakstone, subjected him to numerous "tangible employment actions," and exercised the "official power of the enterprise" against him.

Both parties point for support to *Cariglia v. Hertz Equip. Rental Corp.,* 363 F.3d 77 (1st Cir.2004). In *Cariglia,* the First Circuit recently concluded, in an age discrimination case under a Massachusetts state statute, that an employer may be held liable for employment discrimination where the decisionmaker harbored no discriminatory animus, but made the decision based on false or misleading information

provided by an employee who did harbor such animus. *Cariglia,* 363 F.3d at 87–88; *see also Webber v. Int'l Paper, Co,* 326 F.Supp.2d 160, 167 (D.C.Me.). The Postal Service argues that *Cariglia* does not apply, since the employee supplying the manipulated information to the neutral decision-makers was himself a manager.

As in *Cariglia,* the information was being manipulated by the employee, Ms. Philbrook, but, unlike *Cariglia,* the Postal Service had performed an investigation and could not substantiate her allegation. Yet, the Postal Service ignored its own investigation and proceeded as if the manipulated information were true. If the neutral decision-makers in *Cariglia* had been informed the information was being manipulated, but had fired Cariglia anyway, Mr. Cariglia would have been entitled to argue that the "neutral-decisionmakers" were no longer neutral at all and instead had adopted their subordinate's impermissible animus.[19]

As the First Circuit noted in *Reed v. MBNA Marketing Systems,* 333 F.3d 27, 32 n. 1 (1st Cir.2003), where the sexual harassment "is by a non-supervisory co-worker, the employer is liable only if the plaintiff can demonstrate that the employer was negligent", *i.e.,* that it "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action." (quoting *Crowley v. L.L. Bean, Inc.,* 303 F.3d 387, 401 (1st Cir.2002)). Viewing the facts in a light most favorable to Mr. Oakstone, the Postal Service had confirmed that the Philbrook charges were unsubstantiated and it not only failed to implement prompt and appropriate action, but to the contrary, repeatedly punished Mr. Oakstone for

**19.** To this end, it may be significant that *Cariglia* came to the First Circuit after a five-day

bench trial, not a dispositive motion.

what it had concluded was an unfounded complaint. The Postal Service's motion for summary judgment on the sexual harassment theory is denied.

### E. Gender Discrimination.

In addition to the retaliation and gender-based harassment claims, Mr. Oakstone has also posited a claim of sex discrimination. He bases this claim on two factual assertions: (1) that female workers with less experience were granted the expediter training he has been denied; and, (2) that the Postal Service has treated the complaints of female workers more favorably than his complaint.

A *prima facie* case of sex discrimination requires the following: (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and, (4) the position remained open or was filled by a person with similar qualifications.[20] *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Kosereis v. Rhode Island,* 331 F.3d 207, 212–13 (1st Cir.2003). The First Circuit has reiterated that at the *prima facie* stage, a plaintiff is not required to demonstrate in a disparate treatment case that he was treated differently than similarly situated employees who were not in the protected class. *Id.* at 213; *Fernandes v. Costa Bros. Masonry, Inc.,* 199 F.3d 572, 585–86 (1st Cir. 1999); *Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 19 (1st Cir.1999). It has also described the showing for a *prima facie* case as "not onerous" and a "small showing." *Kosereis,* 331 F.3d at 213.

In this case, Mr. Oakstone has clearly demonstrated the first three criteria: (1) he is male; (2) he is qualified for the expediter position; and, (3) he has been denied training and placement in the position. He has also alleged that females who were junior to him have been given the expediter work he has been denied, citing specific examples. These allegations, viewed in a light most favorable to Mr. Oakstone, sustain his burden of demonstrating a *prima facie* case on this issue.

He also asserts his repeated complaints were ignored; whereas, similar complaints from female workers have been promptly investigated and addressed.[21] Again, viewing the pleadings in a light most favorable to Mr. Oakstone, he has sustained his *prima facie* burden on this argument as well.

Applying the *McDonnell Douglas* burden shifting analysis, the burden of production then shifts to the Postal Service to provide a "legitimate, nondiscriminatory reason for its decision." *Kosereis,* 331 F.3d at 212; *Zapata–Matos v. Reckitt & Colman, Inc.,* 277 F.3d 40, 44 (1st Cir. 2002). The Postal Service did not respond to this portion of the analysis, presumably because its motions were based on the strength of the *Huebschen* line of authority. Without a "legitimate, nondiscriminatory reason" for its actions, the Court must deny the Postal Service's motions.

### III. Conclusion.

Defendant Postal Service's Motion to Dismiss and Motion for Summary Judg-

---

**20.** The Postal Service argued that Mr. Oakstone's complaint failed to meet the minimum requirements of notice pleading. It should be noted that the First Circuit, following a recent Supreme Court decision, has clarified there are "no heightened pleading standards for civil rights cases." *Educadores Puertorriquenos en Accion v. Hernandez,* 367 F.3d 61, 67 (1st Cir.2004); *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

**21.** This allegation is found in paragraph 54 of the Complaint, which for purposes of the pending motions is taken as true.

ment are DENIED. Plaintiff Randall Oakstone's Motion to Strike is DENIED.

**SO ORDERED.**