**152**

Nancy L. GUARDIA, Plaintiff

v.

CLINICAL & SUPPORT OPTIONS, INC., Defendant.

Civil Action No. 12–30151–KPN.

United States District Court, D. Massachusetts.

Signed June 3, 2014.

Adam B. Zimmerman, Law Offices of Adam B. Zimmerman, Boston, MA, for Plaintiff.

Amelia J. Holstrom, Timothy F. Murphy, Skoler, Abbott, & Presser, P.C., Springfield, MA, for Defendant.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

*(Document No. 44)*

NEIMAN, United States Magistrate Judge.

Nancy Guardia ("Plaintiff") brings this action against Clinical & Support Options, Inc. ("Defendant"), her former employer, asserting claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, for failing to pay overtime, and under MASS. GEN. LAWS ch. 119, §§ 51A(h) and 51B(*o* ), for retaliation for acting as a mandated reporter.[1] Pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties have consented to the jurisdiction of this court. Defendant presently seeks summary judgment on both of Plaintiff's claims. For the reasons that follow, the court will grant Defendant's motion.

I. *STANDARD OF REVIEW*

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir.2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank,* 27 F.3d 746, 748 (1st Cir.1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.,* 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

II. *BACKGROUND*

The parties do not dispute the following facts, which are construed in a light most favorable to Plaintiff, the non-moving party. In August of 2006, Defendant hired Plaintiff as an Out–Patient Therapist. (Defendant's Statement of Undisputed Material Facts ("Def. SOF") ¶ 1.) The position required a Clinical Master's degree and eligibility for the highest level of license for social workers in Massachusetts. *(Id.* ¶ 3.) Plaintiff, at the time, was a Massachusetts Licensed Independent Clinical Social Worker. *(Id.* ¶ 4.) Defendant is a behavioral health agency which provides a variety of services to children and adults, including counseling, assessments and treatments, and diagnostic and psychiatric evaluations. *(Id.* ¶ 5.) Plaintiff's responsibilities there included providing mental health therapy to individuals, families, and groups. *(Id.* ¶ 9.) Plaintiff was a member of Local 509, SEUI ("Union") while she worked for Defendant, and both Plaintiff

---

1. Plaintiff, through a filing which the court deemed to be her more definite statement, had also asserted claims pursuant to MASS. GEN. LAWS ch. 149, §§ 33B and 33C (Count I) and Article 50 of her union contract (Count III). (*See* Electronic Order No. 13.) The

court granted Defendant's motion to dismiss Count I, and Plaintiff voluntarily dismissed Count III. (Electronic Order No. 21; Doc. No. 42.) Accordingly, only the overtime claim (Count II) and the retaliation claim (Count IV) remain.

and Defendant were subject to a Collective Bargaining Agreement ("CBA") between May 1, 2008 and April 30, 2011. (*Id.* ¶¶ 12–13.) From June of 2007 to December 31, 2009, Plaintiff was a "salaried plus" employee; she was paid a salary of $24,750 per year[2] plus an additional $34 per service rendered over the minimum productivity requirement. (*Id.* ¶ 16.)[3] Thereafter, Plaintiff became a fee-for-service employee, receiving a set fee for each particular service she provided. (*Id.* ¶ 17.)[4]

Defendant requires that each new client go through an intake process in which the client signs a consent to treatment and a consent to bill the insurance company. (*Id.* ¶¶ 40–41.) New clients are also presented with releases at intake through which they can authorize disclosure to outside individuals of confidential communications between Defendant and the client. (*Id.* ¶ 43.) Clients may choose not to sign the confidential communications releases. (*Id.* ¶ 44.) In addition, new clients receive a client handbook which discusses their protected health information and reasons why Defendant might release such information even without a signed release. (*Id.* ¶ 42.) Defendant also maintains a Confidentiality and Privacy Rights Policy, which provides, in part, that employees cannot divulge medical record data unless the client (or his or her authorized representative) has properly consented to the release or the release is otherwise authorized by law, such as . . . child abuse reporting. . . . When required by court-ordered subpoena, employees will consult with a Program Director and receive approval before sending or testifying to confidential information regarding a client's care.

(*Id.* ¶ 103.) The policy goes on to provide that a violation is grounds for disciplinary action, up to and including termination of employment. (*Id.*)[5]

These intake procedures apply even if a client comes to Defendant through the Department of Children and Families ("DCF") or if DCF is otherwise involved with the client. (*Id.* ¶ 46.) As indicated in the Confidentiality and Privacy Rights Policy, however, Defendant permits therapists to disclose information to DCF pursuant to their mandated reporter obligations under M.G.L. c. 119, § 51A ("51A Report") or pursuant to a DCF investigation under M.G.L. c. 119, § 51B ("51B Investigation") without obtaining a signed release from the client. (*Id.* § 47.) When and how a therapist's obligations under sections 51A and 51B are triggered is discussed in more detail below.

---

2. The $24,750 figure was based on a salary of $33,000 for a 1.0 full-time equivalent employee, prorated for her as a .75 full-time equivalent employee. (*Id.* ¶ 16.)

3. While Plaintiff asserts that her "salary was not fixed as it was subject to reduction for variances in the quantity of work performed," (Plaintiff's Additional Statement of Material Facts ("Pl SOF") ¶ 3), the more accurate—and undisputed—explanation is that her *base* salary was not subject to reduction. (Pl. SOF ¶ 16; Exhibit 6 (attached to Def. SOF) Attachment A, at 15.) Plaintiff could, however, earn additional compensation if she exceeded her minimum productivity requirement of 264 billable hours per fiscal quarter. (*Id.*)

4. Apparently, Plaintiff's employment status changed because she was unable to meet her productivity requirement and, as a result, was told that she either had to make up her productivity hours or switch to a fee-for-service arrangement. (Exhibit 1 (attached to Def. SOF) at 133.)

5. In addition, Defendant maintains a Health Insurance Portability and Accountability Act (HIPPA) and Standards for Protection of Personal Information Policy, which prohibits the unauthorized disclosure of a client's medical information to an unauthorized source. (*Id.* ¶ 104.)

Consistent with the requirements of M.G.L. c. 119, Defendant's own Human Rights Policy and Mandated Reporter Policy provides that employees have an ethical and legal obligation to file 51A Reports with DCF when they have reasonable cause to believe that a child under the age of 18 is being abused or neglected. (*Id.* ¶ 105.) That policy also provides that 51A Reports must be discussed with a supervisor and any such report provided to DCF over the phone must be submitted in writing within 48 hours of the initial call. (*Id.* ¶ 106.) Defendant has a contract with DCF to provide parent aid services and parent assessment and evaluation. (*Id.* ¶ 48.) Under the contract, Defendant only reports the assessments and evaluations if the client signs a release or pursuant to a 51A Report or 51B Investigation. (*Id.* ¶ 49; Exhibit 3 (attached to Def. SOF) at 50–51.)

In late December of 2010 or early January of 2011, Plaintiff received a phone call from Ellen Cain, an attorney for DCF, regarding Client A and Client A's husband to whom Plaintiff had been providing services in her capacity as an Out–Patient Therapist.[6] (Def. SOF ¶¶ 50, 52, 53–54; Plaintiff's Reply to Defendant's Statement of Material Facts ("Pl. Response") ¶ 50.) A court hearing to remove the parental rights of Client A and her husband to their two minor children was scheduled for that week. (Plaintiff's Additional Statement of Material Facts ("Pl. SOF") ¶ 6.) After Plaintiff informed Cain that she had met with Client A and her husband together on several occasions and separately one time each, Cain asked whether Plaintiff had any concerns about their parenting ability.

(Def. SOF ¶¶ 55–56.) Plaintiff, knowing that Client A and her husband had previously lost their parental rights to another child, was concerned that her failure to answer Cain could result in the minor children—who were residing in foster care at the time—being returned to Client A and her husband. (Pl SOF ¶ 8.) Accordingly, Plaintiff shared with Cain that she did have some concerns, explaining that Client A was in "early recovery" and that she usually recommends to such clients that early recovery be made their priority. (Def. SOF ¶¶ 58–59.) [7]

Prior to disclosing this information to Cain, Plaintiff failed to check Client A's file to see if she had signed a confidential communications release. (Def. SOF ¶ 60.) At the end of the conversation, Cain asked Plaintiff to fax her the confidential communications release for Client A and her husband. (*Id.* ¶ 63.) It was only at this point that Plaintiff checked Client A's files and discovered the absence of the release. (*Id.* ¶¶ 61, 64.) Plaintiff then spoke with her supervisor, Bonnie Gruszecki, and explained that Client A's file did not contain a release and she did not know why. (*Id.* ¶ 65.) Plaintiff, it should be noted, did not file a 51A Report regarding Client A's two minor children because they were not at imminent risk of harm, as they had both been in foster care for over fifteen months. (*Id.* ¶ 66.)

On February 24, 2011, Plaintiff received via her personal P.O. Box a complaint, dated February 9, 2011, from the Massachusetts Board of Registration of Social Workers ("Board"). (*Id.* ¶¶ 68–69.) The complaint had been made by Client A, who

---

6. For confidentiality purposes, the parties have not identified Client A or her husband.

7. Plaintiff testified at her deposition that, by "early recovery," she meant someone who has had less than one year of sobriety. (Ex-

hibit 1 (attached to Def. SOF) at 70.) Plaintiff testified, however, that she did not specify the meaning of the phrase to Cain and that she did not know whether Cain understood what she meant by it. (*Id.*)

alleged that Plaintiff had disclosed information about her to DCF without a proper release. (*Id.* ¶¶ 69–70.) Upon receipt, Plaintiff spoke with Gruszecki and Amy Olson, the Clinical Director, about the complaint. (*Id.* ¶ 71.) Plaintiff indicated to Olson that she wanted to speak with Defendant's attorney, but Olson explained that such action was premature and may not be necessary in light of the subpoena which Olson thought Defendant had received from DCF requesting information about Client A. (*Id.* ¶¶ 72, 73.) Defendant had in fact received a subpoena from DCF on December 31, 2010, but it merely requested Client A's and her husband's "attendance records only at therapy from 1–1–09 to 12–31–10." (*Id.* ¶ 74.) In any event, Plaintiff was not aware of the subpoena when she disclosed the information to Cain. (*Id.* ¶ 76.)

On February 24, 2011, Plaintiff, Olson and Gruszecki together drafted a response to the complaint and attached the December 31, 2010 subpoena to it. (*Id.* ¶ 77.) Defendant's Office Manager, Micki Mitzkovitz, mailed Plaintiff's response on her way home from work on February 25, 2011. (*Id.* ¶ 80.) Olson also faxed the response to the Board on Plaintiff's behalf on March 4, 2011. (*Id.* ¶ 81.)

Article 50, section 1 of the CBA provides:

> The Employer will carry professional liability insurance which indemnifies employees for legal claims arising from their employment for [Defendant]. Employees who have engaged in gross misconduct may not be indemnified. The Employer will notify an employee of its decision not to indemnify him/her. A decision by the Employer not to indemnify an employee is subject to the grievance procedure.

(*Id.* ¶ 82; Exhibit 6 (attached to Def. SOF) Attachment A.) Defendant's professional liability insurance policy at the time covered "suits" seeking "damages" against Defendant and/or its employees arising out of a "professional incident" in certain circumstances. (*Id.* ¶ 84; Exhibit 9 (attached to Def. SOF) Attachment A.) The policy defined "suits" as "a civil proceeding in which 'damages' are sought and to which this insurance applies." (*Id.* ¶ 87.) It defined "damages" as "a monetary: a. Judgment; b. Award; or c. Settlement." (*Id.* ¶ 88.)

After Defendant became aware of the Board complaint, Melody Arsenault, the Human Resources Director, called Defendant's insurance broker, Matt Geffin, to inquire whether the policy would cover the Board proceedings. (Def. SOF ¶ 85.)[6] Based on that conversation, Arsenault understood that Geffin had called the insurance adjuster and learned that the policy would not apply to the Board complaint because it was a claim against a personal license and not a civil suit for monetary damages as defined by the policy. (*Id.* ¶¶ 86, 89.) Following Plaintiff's response to the Board complaint, she again contacted Olson about speaking with Defendant's

---

**6.** Plaintiff argues that the court should disregard this information because it was not disclosed until Plaintiff's attorney deposed Karin Jeffers, the President and CEO of Defendant, on January 24, 2014—a period which Plaintiff asserts was "outside the time for discovery when any contrary evidence might have been adduced"—and Defendant never produced written correspondence regarding the conversation. In response, Defendant explains that discovery was not closed at the time of Jeffers' deposition (*see* Doc. No. 40), that Plaintiff could have requested additional discovery on the matter, and that there is no written correspondence regarding the conversation. Because Plaintiff failed to provide any support for this request and has presented no evidence to dispute Defendant's assertion regarding the conversation, the court will not disregard it.

attorney. (*Id.* ¶ 91.) Olson, however, explained that Defendant had decided that the Board complaint was a private matter and that it would be inappropriate for Defendant to be involved. (*Id.*) Plaintiff had a similar conversation with Arsenault. (*Id.* ¶ 92.) Ultimately, Defendant decided not to retain a lawyer to defend the Board complaint because, in its view, it was under no obligation to do so and, as the insurance adjuster explained to Geffin, the matter was not covered by the professional liability policy. (*Id.* ¶ 93.)

Thereafter, Plaintiff hired her own attorney, who assisted her with submitting a supplemental response to the Board on March 8, 2011. (*Id.* ¶ 94.) The supplemental response stated, in part: "When I made these disclosures [to Cain], I assumed and believed in good faith that both [Client A] and [her husband], as parents whose children were in the custody of DCF, had executed the usual waiver of confidentiality with respect to their treatment records in favor of DCF." (*Id.* ¶ 95; Exhibit 10 (attached to Def. SOF).) Plaintiff also stated in the supplemental response that,

> [e]ven in the absence of a waiver, it was my clinical opinion that the minor children would be at serious risk of violence or might otherwise be if they were returned to the custody of their father. I am a mandated reporter, obligated by statute and professional standards of conduct to discuss well-founded concerns about a child's safety with the custodial agency.

(Exhibit 10 (attached to Def. SOF).)

At some point after learning of the Board complaint and Plaintiff's possible

breach of confidentiality, Olson conducted an internal investigation into Plaintiff's disclosure to Cain. (Def. SOF.¶ 96.) During that investigation, Olson found no evidence that Plaintiff had filed a 51A Report or that Cain was conducting a 51B Investigation regarding Client A. (*Id.* ¶ 100.) Olson also confirmed that the December 31, 2010 subpoena covered attendance records only. (*Id.* ¶ 102.) Accordingly, Olson concluded that Plaintiff had disclosed confidential information about a client being in early recovery to a DCF attorney without the client's permission or a confidential communications release. (*Id.* ¶ 103.) Olson discussed these findings with Arsenault and Karen Poisson, Olson's supervisor. (*Id.* ¶ 107.) Thereafter, Defendant determined that Plaintiff's disclosure warranted a written warning under its policies. (*Id.* ¶ 108.)

On March 4, 2011, Plaintiff had Heather Booth, a Union steward, file a Step 1 grievance on her behalf because she believed that Defendant had violated Article 50 of the CBA by denying her liability coverage.[7] (*Id.* ¶¶ 111–112.) On March 15, 2011, Plaintiff met with Booth, Gruszecki, Olson and Pamela Powers, Defendant's Human Resources Manager, regarding the grievance. (*Id.* ¶ 113.) Powers, who led the meeting, informed Plaintiff that the matter was personal and that it was her responsibility. (*Id.* ¶ 114.) At the conclusion of the meeting, Olson told Plaintiff that Defendant conducted an internal investigation into the Board complaint and that there would be a mandatory meeting to discuss the find-

---

**7.** The grievance procedure, contained within Article 37 of the CBA, includes three steps. (Pl. SOF ¶ 83.) First, the employee submits a written grievance to her immediate Program Director detailing the alleged violation of the CBA and the nature of the problem. (*Id.*) Second, if the problem is not resolved in ten working days, the employee meets with the Senior Program Director. (*Id.*) Third, if the problem is still not resolved, the employee may demand that the matter be submitted to arbitration. (*Id.*)

ings. (*Id.* ¶ 115.) Olson also stated that Plaintiff could have a Union representative attend the meeting and that, because it was a Union matter, Olson could not speak about it any further with her.(*Id.*) On March 25, 2011, Powers issued Defendant's written response to Plaintiff's Step 1 grievance, in which she explained that if a lawsuit were filed Plaintiff could utilize the professional liability policy but that the Board complaint was a personal matter and, as such, was Plaintiff's responsibility. (Id ¶ 116.) Plaintiff did not go on to use Step 2 of the grievance procedure. (*Id.* ¶ 117.)

On March 28, 2011, Arsenault sent an email to Plaintiff informing her that a meeting was scheduled for April 4 with Gruszecki regarding disciplinary action and that Plaintiff had a right to have a Union steward present. (*Id.* ¶ 118.) Approximately two hours later, Plaintiff sent an email to Gruszecki stating that she would be resigning on April 8, 2011. (*Id.* ¶¶ 120, 125; Exhibit 12 (attached to Def. SOF) Attachment C.) In her email, Plaintiff referenced a conversation she had with Gruszecki "in mid-February about [her] move to New York and subsequent plan to resign in April." (Def. SOF ¶ 125; Exhibit 12 (attached to Def. SOF) Attachment C.) Plaintiff apparently had a long-term plan to resign because her partner had moved to New York and she had been traveling to and from there on weekends; she had also discussed her intent to resign with several of Defendant's employees. (Def. SOF ¶¶ 121–122.) Plaintiff now asserts, however, that she never had a "definite" plan to resign until March 28, 2011. (Pl. SOF ¶ 26.) Plaintiff also maintains that she believed she was going to be terminated for the confidentiality issue, so she preemptively resigned to avoid termination. (Pl. SOF ¶ 25.)

Thereafter, Plaintiff and Arsenault exchanged emails about the upcoming April 4 meeting, in which Plaintiff asked, among other things, what "corrective action" defendant would be taking. (Def. SOF ¶¶ 126–127.) In response, Arsenault explained that the purpose of the meeting was to discuss the allegations and the corrective action, and she referred Plaintiff to the employee handbook. (Def. SOF ¶ 128.) Defendant's preference and practice is to discuss disciplinary action with employees in person, rather than through email because of Union steward availability and to protect the employee's rights under the CBA. (*Id.* ¶ 129.) Plaintiff did not attend the April 4, 2011 meeting. (*Id.* ¶ 131.)

With regard to the complaint filed by Client A, the Board of Registration of Social Workers found that it had merit and the Division of Professional Licensure would "prosecute" Plaintiff's license. (*Id.* ¶ 133.) Ultimately, the Division of Professional Licensure and Plaintiff reached an agreement whereby she would be issued an advisory letter. (*Id.* ¶ 134.) Plaintiff commenced this action on August 27, 2012. (Doc. No. 1.)

### III. DISCUSSION

### A. FLSA Overtime Claim (Count II)

With regard to the first of her two remaining claims, Plaintiff asserts that Defendant mis-classified her as exempt from overtime compensation under the learned professional exemption, 29 C.F.R. §§ 541.300(a)(2)(i) and 541.301(a), from June of 2007 to December 31, 2009, during which time she worked as a "salaried plus" employee. In seeking summary judgment on this claim, Defendant argues that it is untimely and that Plaintiff fell within the exemption and, therefore, Defendant did not violate the FLSA. The court agrees

with Defendant.[8]

■ As an initial matter, Defendant contends that the statute of limitations bars this claim because Plaintiff brought it over two years after it accrued and has failed to provide any evidence of willfulness to extend that statute. Under 29 U.S.C. § 255(a), unpaid overtime claims must be brought within two years after the cause of action accrued, except as to causes of action arising out of a willful violation, which must be brought within three years after they accrue. As Plaintiff acknowledges, she did not commence this action until August 27, 2012, over two years after she last was employed as a "salaried plus" employee. Moreover, as Defendant asserts, Plaintiff has not proffered sufficient evidence to demonstrate willfulness on Defendant's part, thereby foreclosing a three-year statute of limitations. Yet, even assuming that the three year limitations period might apply, thus rendering Plaintiff's claim timely, the court nonetheless concludes that the claim fails as a matter of law.

■ As a general rule, employers are required to pay employees overtime for hours worked in excess of forty per week. 29 U.S.C. § 207(a)(1). Under 29 U.S.C. § 213(a)(1), however, "any employee employed in a bona fide executive, administrative, or professional capacity" is exempt from this overtime requirement. An employee falls within the learned professional subset of the bona fide professional exemption if he or she is (1) "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week" and (2) his or her "primary duty is the performance of work ... [r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of

specialized intellectual instruction." 29 C.F.R. §§ 541.300(a) and 541.301(a). Plaintiff does not dispute that her job responsibilities met the second prong, the primary duty test. The only remaining question, then, concerns the first prong, *i.e.,* whether she was compensated on a "salary basis" of at least $455 per week. The term "salary basis" is defined in 29 C.F.R. § 541.602, which provides:

> An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all *or part* of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of work performed.

29 C.F.R. § 541.602(a) (emphasis added). Since Plaintiff's base salary was $475.96 per week, *i.e.,* $24,750 per year divided by 52, Defendant would appear exempt from paying her overtime.

Nonetheless, Plaintiff argues that her compensation was potentially "subject to reduction" due to variations in the quantity of work performed because she might receive lower pay if she did not meet her productivity requirements. It is undisputed, however, that Plaintiff's base salary was *not* subject to reduction while she worked as a "salaried plus" employee, even if she did not meet her productivity requirements. As Defendant explains, 29 C.F.R. §§ 541.300(a) and 541.602 are satisfied here because Plaintiff "regularly receive[d] each pay period ... a predetermined amount constituting ... part of her compensation" in excess of $455 per week. In fact, yet another regulation, 29 C.F.R. § 541.604, explicitly approves Plaintiff's "salaried plus" situation:

---

8. As Plaintiff acknowledged through counsel at oral argument, she is not pursuing any type of wage claim with respect to her later status as a fee-for-service employee.

An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount on a salary basis. Thus, for example, an exempt employee guaranteed at least $455 each week paid on a salary basis may also receive additional compensation of a one percent commission on sales.

29 C.F.R. § 541.604(a); *see also Litz v. Saint Consulting Group, Inc.,* 2013 WL 5205868, at *1 (D.Mass. Sept. 13, 2013) ("As long as at least the minimum $455 per week is paid no matter what, the exemption applies even if that assured minimum is supplemented by other compensation, such as sales commissions or a share of profits.").

At oral argument, Plaintiff's counsel explained that her claim also rests on Defendant's later reclassification as a fee-for-service employee following her failure to meet productivity requirements. According to Plaintiff, the "subject to reduction" language in 29 C.F.R. § 541.602 applies not only to contemporaneous reductions of an employee's salary, *i.e.,* reductions that take effect within a pay period because of work performed during that period, but also to possible prospective reductions, *i.e.,* reductions that might take effect in future pay periods. Thus, Plaintiff's argument goes, when Defendant later switched Plaintiff to a fee-for-service employee, it reduced her compensation "because of variations in the quality or quantity of work performed" in violation of 29 C.F.R. § 541.602. The court is not persuaded.

As Defendant asserted at oral argument, section 541.602 does not encompass this type of change to an employee's salary. Not only is this interpretation clear from the language of the regulation itself, but case law supports this interpretation as well. As was true in *Caperci v. Rite Aid Corp.,* 43 F.Supp.2d 83, 97 (D.Mass.1999), "Plaintiff['s] argument assumes that, once the employer and employee enter into an agreement that provides for the payment of a predetermined amount, that agreement can never be amended, and, therefore, that the predetermined amount that is to be paid under it can never be changed." That assumption, the court concluded, was simply incorrect: "There is ... nothing in the regulation that says or implies that employment arrangements, once made, cannot be amended, terminated, or superceded." *Id.* To be sure, the regulation "prohibits various deductions from the contractual salary, but it contains no explicit requirement that the salary set ('determined') for one pay period be continued to the next.... Thus, [the court] would read the regulation as prohibiting only reductions in pay made in response to certain events in a period for which the pay had been set, not salary reductions to take effect in future pay period." *In re Wal–Mart Stores, Inc.,* 395 F.3d 1177, 1184 (10th Cir.2005).[9]

Of course, there may be a "sham exception" for situations in which an employer makes changes to an employee's salary "so frequent[ly] as to make the salary the functional equivalent of an hourly wage." *Id.* at 1189; *see also Caperci,* 43 F.Supp.2d at 97 n. 14 ("Suppose, for example, that an

---

9. Both cases also relied on Department of Labor Opinion Letters which interpreted the regulation in this manner. *See Caperci,* 43 F.Supp.2d at 97 (citing *Wage & Hour Opinion Letter dated November 13, 1970,* 1970 WL 26462); *In re Wal–Mart Stores, Inc.,* 395 F.3d at 1185–86 (citing *Wage & Hour Opinion Letter dated* February 23, 1998, 1998 WL 852696; *Wage & Hour Opinion Letter dated* March 4, 1997, 1997 WL 998010; and *Wage & Hour Opinion Letter dated November 13, 1970,* 1970 WL 26462).

employer had a regular practice each Friday of informing its professional staff of the work schedule for the following week and of making prospective adjustments in compensation to reflect any changes."). Such an exception clearly would not apply here, however, since Plaintiff worked as a "salaried plus" employee for over two years before being switched to fee-for-service.

Accordingly, the court will grant Defendant's motion for summary judgment as to Count II.

## B. *Mandated Reporter Retaliation Claim (Count IV)*

In Count IV, Plaintiff asserts that Defendant retaliated against her, in violation of M.G.L. c. 119, §§ 51A(h) and 51B(*o*), for acting as a mandated reporter when speaking with Cain about Client A. Defendant contends that the mandated reporter anti-retaliation provisions do not apply here because Plaintiff did not file a 51A Report and was not responding to a 51B Investigation, that it took no adverse employment action against Plaintiff, and that it had legitimate, non-retaliatory reasons for not indemnifying her and for issuing the written warning. In response, Plaintiff argues that she reasonably believed that she was required to disclose the information to Cain and, thus, the mandated reporter anti-retaliation provisions apply. Plaintiff also argues that there is sufficient evidence of retaliation. The court, for its part, concludes that the anti-retaliation provisions do not apply in this context and, accordingly, the various aspects of Plaintiff's claims in Count IV must all fail.

Under the version of the mandated reporter statute which was effective from July 1, 2010 to February 18, 2012,

[a] mandated reporter who, in his professional capacity, has reasonable cause to believe that a child is suffering physical or emotional injury resulting from: (i) abuse inflicted upon him which causes harm or substantial risk of harm to the child's health or welfare, including sexual abuse; (ii) neglect, including malnutrition; or (iii) physical dependence upon an addictive drug at birth, shall immediately communicate with the department orally and, within 48 hours, shall file a written report with the department detailing the suspected abuse or neglect.

M.G.L. c. 119, § 51A(a).[10] Included within the definition of "mandated reporter" were and are "clinical social worker[s]." *See* M.G.L. c. 119, § 21. Under section 51A(h), "[n]o employer shall discharge, discriminate or retaliate against a mandated reporter who, in good faith, files a report under this section, testifies or is about to testify in any proceeding involving child abuse or neglect." M.G.L. c. 119, § 51A(h).

As to 51B Investigations, section 51B(a) provides:

[u]pon receipt of a report filed under section 51A, the department shall investigate the suspected child abuse or neglect, provide a written evaluation of the household of the child, including the parents and home environment and make a written determination relative to the safety of and risk posed to the child and whether the suspected child abuse or neglect is substantiated.

M.G.L. c. 119, § 51B(a). In turn, section 51B(m) provides:

---

**10.** The current version of the statute sets forth two additional causes of suspected child abuse which trigger reporting obligations: "(iv) being a sexually exploited child; or (v) being a human trafficking victim as defined by section 20M of chapter 233." M.G.L. c. 119, § 51A(a).

[n]otwithstanding any privilege created by statute or common law relating to confidential communications or any statute prohibiting the disclosure of information but subject to subsection (j) of section 51A, a mandated reporter shall answer questions and provide information posed by the department relating to an investigation conducted under this section, whether or not that person filed the 51A report being investigated.

M.G.L. c. 119, § 51B(m). Moreover, under section 51B(*o* ), "[n]o employer shall discharge, discriminate or retaliate against a mandated reporter who, in good faith, provides such information, testifies or is about to testify in any proceeding involving child abuse or neglect unless such person perpetrated or inflicted such abuse or neglect." M.G.L. c. 119, § 51B(*o* ).

■ As the language of section 51A(a) makes clear, the mandated reporter obligations are triggered when there is reasonable cause to believe that a child is suffering physical or emotional injury. M.G.L. c. 119, § 51A(a). Here, it is undisputed that Plaintiff lacked reasonable cause to believe that Client A's two minor children were then suffering from abuse or neglect, as they were residing in foster care at the time, not with Client A or her husband. Indeed, it is undisputed that Plaintiff did not provide a 51A Report— orally or in writing—for this very reason.

■ Nonetheless, Plaintiff appears to argue that the statutory scheme applies to her because she feared harm to the children in the event that Client A re-gained custody. But such speculative fear of future harm does not trigger section 51A(a) and, thus, cannot form the basis of a retali-

ation claim under section 51A(h), which prohibits retaliation against mandated reporters who "file[ ] a report under this section." As it turns out, the Appeals Court of Massachusetts addressed a similar situation in *Enright v. Special Adoption Family Servs., Inc.*, 52 Mass.App.Ct. 1102, 2001 WL 718281 (Mass.App.Ct. June 26, 2001) (unpublished), albeit in dicta. There, the plaintiff "conceded that her 'conduct of reporting potential harm to children did not rise to the level of a required G.L. c. 119, § 51A mandatory report' and that she was only notifying DSS of deficiencies within Special Adoption which she *believed* would lead to harm to children." *Id.* at *1 n. 4 (emphasis in original). As the Appeals Court explained, because the plaintiff "did not file a § 51A report, she cannot establish that she was terminated for complying with the mandates of this statutory provision." *Id.* The same is true here as well. Moreover, Plaintiff resigned on her own accord; she was not terminated, even constructively so.

Likewise, it is clear that 51B Investigations only arise "[u]pon receipt of a report under 51A." M.G.L. c. 119, § 51B(a). Granted, under section 51B(m), mandated reporters are obligated to "answer questions and provide information posed by" DCF even if they did not file a 51A Report, but only if such questions or information "relat[e] to an investigation conducted under this section," *i.e.*, a 51B Investigation. M.G.L. c. 119, § 51B(m). Plaintiff, however, has presented no evidence whatsoever that Cain was conducting a 51B Investigation at the time (or, indeed, that Plaintiff thought that Cain was conducting such an investigation).[11]

---

11. Moreover, M.G.L. c. 119, § 51B(d) requires that a 51B Investigation conclude, at the latest, within fifteen business days of the filing of a 51A Report, "unless a waiver has been approved by the area director or re-quested by law enforcement." Thus, even if there had been a 51B Investigation around the time the children were placed in foster care—and there is no evidence to that effect— it is not at all likely that such an investigation

In fact, both Plaintiff's and Cain's conduct confirms that neither believed a 51B Investigation was under way. At the end of their conversation, Cain asked Plaintiff for Client's A's confidential communications release, despite the fact that she would not have needed it under the terms of DCF's contract with Defendant or section 51B(m) if she was actually conducting a 51B Investigation. And Plaintiff admittedly shared the information because she assumed that a release would be in Client A's file, only to discover when checking that the file did not contain a release; in this vein, Plaintiff also explained in her supplemental response to the Board that, when making the disclosures, she believed that Client A signed the release. Accordingly, because section 51B(*o* ) only prohibits retaliation against a mandated reporter who "provides such information"—referencing information "relating to" a 51B Investigation under section 51B(m)—and because Plaintiff failed to provide any evidence that she spoke to Cain pursuant to a 51B Investigation, the anti-retaliation provision simply does not apply.

To be sure, Plaintiff is correct that the legislative intent of chapter 119 is the protection of children, *see* M.G.L. c. 119, § 1, and that such intent might be furthered by providing broader mandated reporter obligations and concomitant anti-retaliation provisions. But such broad legislative intent cannot trump the plain language of the statutes. Simply stated, it is the legislature's province to craft the law in the manner it deems best, and the court must give effect to the language used. Having done that, the court concludes that Plaintiff's actions here find no protection in the statutory scheme.

would have been on-going when Cain spoke

## IV. CONCLUSION

For the reasons stated, Defendant's motion for summary judgment is ALLOWED.

IT IS SO ORDERED.