STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss                                      CIVIL ACTION
                                               DOCKET NO. CV-16-166

ANN MARIE BARTER,

        Plaintiff

v.                                                      ORDER

REGIONAL SCHOOL UNIT 5,

        Defendant

STATE OF MAINE
Cumberland, ss, Clerk's Office

APR 2 4 2018
1:17 PM
RECEIVED

This action involves a complaint by plaintiff Ann Marie Barter which alleges that she was subjected to adverse action by defendant Regional School Unit 5 in retaliation for complaints that she had been subjected to discrimination in violation of the Maine Human Rights Act.

A jury-waived trial was held in the above-case on January 18, 19, 22, and 23. The parties thereafter submitted proposed findings of fact and post-trial briefs.

Plaintiff has the burden of proof by a preponderance of the evidence, and the factual findings in this order are found to be more likely true than not.

The court makes the following findings of fact and conclusions of law:

1. Ann Marie Barter obtained a bachelor's degree in Illinois in 1986, taught high school French for three years in Illinois, and thereafter moved to Maine. She obtained an M.A. degree in mental health counselling from the University of Southern Maine in 1994 or 1995.

2. From 1992 through 1996 she worked at Windham Adult Education and earned several significant awards as an Adult Education teacher.

3. In 2009 she began working as a staff development specialist at the Long Creek Youth Development Center and then served as Assistant Principal at Long Creek's combined middle and high school during the 2010-11 and 2011-12 school years.

4. She became Assistant Principal at Freeport High School, part of RSU 5, in October 2012. At the time she was hired RSU 5 was just beginning the process of implementing the system of Proficiency-Based Education (PBE) required by recently enacted state legislation.

5. During the 2012-13 and 2013-14 school years Barter worked with Bob Strong, who was the Freeport High Principal. Strong planned to retire at the end of the 2013-14 school year and was not interested in developing a PBE curriculum, so Barter took the lead on the PBE curriculum during the 2012-13 and 2013-14 school years.

6. In many cases assistant principals are supervised and evaluated by the school principals. However, the Superintendent of RSU 5 at the time Barter was hired, Shannon Welsh, had chosen to evaluate all of the administrative-level personnel at RSU 5 schools, including principals, assistant principals, and other administrators. Accordingly, Barter was evaluated by Superintendent Welsh during the 2012-13 and 2013-14 school years.[1]

7. After the 2012-13 school year Barter received a formal evaluation from Superintendent Welsh. That evaluation was positive.[2] In addition to evaluations, employees received performance growth plans (essentially a list of areas for improvement), and Barter's performance growth plan

---

[1] As discussed below, the fact that Welsh had evaluated and supervised Barter in those years resulted in uncertainty with respect to the line of authority between Principal and Assistant Principal once Bob Strong left.

[2] The evaluation form rated various categories of an employee's performance with ratings of "E" (exceeds performance levels – highest rating), "R" (recognition for achievement), "M" (meets performance levels), "P" (partially meets performance levels), and "D" (does not meet performance levels). In her September 2013 evaluation, Barter received one "E", five "R", and three "M" ratings.

2

for 2013-14 (Ex. 2) was to focus on better strategies for conversations with staff and for time management.

8. Issues with Barter's performance arose during the 2013-14 school year. Superintendent Welsh became aware that teachers had raised concerns that Barter was not supporting their classroom decisions with respect to student discipline, and some had also raised concerns about their interactions with her. This in fact rose to the level where some teachers took the unusual step of providing a survey to Superintendent Welsh that questioned Barter's trustworthiness.

9. The practice in RSU 5 was that school administrators were ordinarily given one-year contracts during the first two years of their employment and two-year contracts after that. Barter had received a second one-year contract for the 2013-14 school year and was given a two-year contract in March 2014. In line with Superintendent Welsh's practice, that contract indicated that Barter would be supervised and evaluated by the Superintendent.

10. However, in light of the concerns that had been raised, Superintendent Welsh placed Barter on a performance growth plan ending in January 2015 (Exhibit 1, dated May 23, 2014). This was designed to address the concerns about Barter's transparency in communicating with staff and to increase trust. Barter was not placed on a formal action plan, but Welsh described Barter's need for improvement as "essentially an action plan."

11. Welsh, along with Bob Strong, retired at the end of the 2013-14 school year. While looking for a permanent superintendent, RSU 5 hired two retired superintendents, William Michaud and Michael LaFortune, as part-time superintendents for the 2014-15 school year. Both had lengthy careers in education and had previously served as superintendents in multiple school districts.

3

12. In briefing Michaud and LaFortune, Shannon Welsh specifically brought the concerns that had been raised about Barter to their attention and told them that a decision about Barter might need to be made around the end of 2014.

13. In the late spring of 2014, before Superintendent Welsh retired, Freeport High School had begun the process of hiring a new principal to replace Bob Strong. Although Barter testified that Superintendent Welsh repeatedly encouraged her to apply for the principal's position, Barter's testimony was contradicted by Welsh, who stated that she had never encouraged Barter to apply to be the Principal and that she could not have supported Barter's candidacy. This was at the same time that Superintendent Welsh was having discussions with Barter about her performance growth plan and telling her that significant performance improvement had to be made by the end of 2014.

14. The court credits Welsh's testimony on this issue. This is one of a number of instances where the court did not find Barter's testimony to be credible and is also emblematic of differences between Barter's self-portrayal and the way she was seen by others.

15. Superintendent Welsh did encourage Barter to serve on the interview committee because Barter would be working with the new principal.

16. Brian Campbell, who had previously been an Assistant Principal at Morse High School and had served for four years as Principal at the combined middle and high school in Searsport, was one of the persons who applied to be Freeport High School Principal. In part because he already had extensive experience developing a proficiency-based education curriculum, he was perceived to be the strongest candidate by the interview committee – with the notable exception of Barter.

17. Barter was a vocal opponent of Campbell's candidacy and continued to express her opposition even after it became clear that the vast majority of committee members strongly

4

supported him. This got to the point where Superintendent Welsh felt that Barter's continued and lengthy statements in opposition were impeding the committee and were damaging Barter in the eyes of the committee members. Ultimately, once she saw that Campbell was going to be offered the job over her objections, Barter said that she would support Campbell going forward.

18. Following his hiring, Campbell visited the school to meet the staff and some students on June 9. When Barter was about to leave for the day, she thanked him for coming and hoped his back was feeling better (Campbell was experiencing some back problems). Campbell answered, "Thanks, hon." Barter did not say anything at the time but that evening she emailed Superintendent Welsh to say that she was uncomfortable with that comment and was planning to email Campbell to tell him so.

19. At the end of an email to Campbell on other subjects on June 10, Barter added, "On another note, I would prefer that you not refer to me as hun. Thanks, Ann Marie."[3] Campbell responded by email, "No problem. Do it with everyone. Will keep it very professional." Campbell did not address Barter as "hon" again.

20. Around this same time, Campbell raised the subject of the office layout in the high school administrative area because he did not favor the location of the office that had been used by Bob Strong. Barter sent Campbell an email stating that Craig Sickels, who was the RSU 5 athletic director and who had an office in the administrative area, did not like his office and was elsewhere several days each week. She also stated that Sickels had been the Attendance Coordinator during the past year and that typically Sickels was assigned that job.[4] Barter did not

---

[3] In her emails Barter spells the word used as "hun." In this order, except where directly quoting Barter, the court will refer to the word used as "hon."

[4] The Attendance Coordinator role involved checking on, recording, and reporting absences and was not a particularly desirable assignment.

send a copy of the email to Sickels, who in fact liked his office, who was not away from the office as much as Barter had stated, and who was not typically assigned – and did not want – to work as Attendance Coordinator.[5] Sickels was given a copy of Barter's email by a secretary who had seen it[6] and eventually told Campbell that it was misleading and inaccurate.

21. In July Barter met with Acting Superintendents LaFortune and Michaud, who were meeting with all the administrative-level personnel individually. They were used to an arrangement where an assistant principal would be supervised by the principal. When that subject came up, Barter explained that she had previously been supervised by Shannon Welsh and did not want that arrangement to change. They said they would consider that. Based on what Welsh had told him, Michaud was under the impression that Barter was on an action plan. When Barter disagreed, he checked her file and confirmed that she had not been placed on a formal action plan.

22. In August 2014 there were discussions between Barter and Campbell as to how their responsibilities would be divided and what tasks would be assigned to Barter. Barter was concerned about this because under Strong she had enjoyed being the lead person on proficiency-based education, which was a major area of Campbell's expertise.

23. Sometime around the second week of August, when Barter mentioned to Campbell that she was going to a sleep study, he responded to the effect that he had also had a sleep study and had made the mistake of forgetting his pajamas so he had gone "commando." She responded by saying, "TMI" (too much information). She later overheard him tell the same thing to others, who laughed in response.

---

[5] Barter had previously been the Attendance Coordinator but at some point during the 2013-14 school year Sickels took over that responsibility under what he understood was a temporary accommodation to allow Barter to focus on PBE.

[6] The secretary gave the email to Sickels with a comment to the effect that Barter "just threw you under the bus."

6

24. Sometime around August 21, Barter and Campbell created a "Google Doc" setting forth their initial understanding with respect to their areas of responsibility, described by Campbell as a work in progress. The August 21 document had three columns. The first was entitled "Shared Responsibilities" with a notation that "shared does not mean 50/50." The items in that column included "PBE". The second column was entitled "Brian Lead Person." The items in that column also included "PBE" as well as "Attendance Coordinator (w/ Craig.)" The third column was entitled "AM Lead Person." The items in that column included "PBE tasks as assigned" and "Discipline."

25. From the time period from late June through the first several weeks of the 2014-15 school term, there were several incidents which reasonably led Campbell to believe that Barter was not always accurate in reporting information and had a practice of talking behind people's backs. Some of these incidents were substantiated by evidence at the trial and are also relevant because Barter's case depends almost entirely on her own credibility, and there were enough instances when her testimony was contradicted by other witnesses that the court does not accept her version of events on disputed issues.

26. The incidents included Barter's previously discussed email without copying Sickels, a report to Campbell by Barter that staff members had felt overwhelmed on the first day of school (contradicted when Campbell made inquiries directly to the purported source of that information), and an incident when Barter went to Alexis Rog and requested to speak with her in confidence about Campbell (Rog declined to meet in confidence and told Campbell about the request). Campbell also believed that Barter had not followed his instructions with respect to when Barter's secretary had to be available to answer phones and that there was a discrepancy between what

7

Barter was telling him and what other staff members were telling him about the guidance that Barter had given to staff relating to proficiency-based education.

27. Concerned about the issues referred to above, Campbell scheduled a meeting with Barter at the end of the day on Friday September 12 to clear the air. Barter testified that Campbell had yelled at her but she had not raised her voice at the meeting. This was inconsistent with Campbell's testimony and the testimony of other witnesses who could hear voices in Campbell's office although they could not make out what was said. Those witnesses testified that both Barter and Campbell had raised their voices equally, and at times they both were attempting to speak over each other. At the end of the meeting, Barter and Campbell both calmed down and agreed that they needed to work together and move on.

28. However, over the ensuing weekend Barter wrote an email to Acting Superintendents Michaud and LaFortune stating in effect that she did not think she could work with Campbell and asking to meet with Michaud without Campbell present. Campbell was not copied on the email. In the email Barter repeatedly mentioned that Campbell had yelled at her during their recent meeting, without mentioning that both she and Campbell had raised their voices, and stated she had difficulty working in an environment that did not feel respectful and safe.

29. In the email Barter discussed a number of the subjects that Campbell had raised with her on September 14, offering her own version of the events and indicating that she was having difficulty working with Campbell.

30. In the email, Barter also informed Michaud and LaFortune that Campbell had called her "hon" on one occasion and that she had reported that to Shannon Welsh. She suggested that some would see that as sexual harassment. She also stated that she had heard Campbell call a student "hon" on one occasion and that he had also called his secretary "hon" on one occasion.

She added that the secretary had previously been so offended at being called "hon" by a custodian that the secretary had reported it and the custodian had been transferred.[7]

31. In the email Barter also informed Michaud and LaFortune about Campbell's comment that he had had to go "commando" at the sleep study, saying that it made her uncomfortable and that she did not find it appropriate for work.

32. Michaud responded by declining to set up a meeting solely with Barter and by scheduling a meeting with himself, LaFortune, Barter, and Campbell on September 17. Before that meeting Michaud instructed Barter to provide a copy of her email to Campbell. She did not do so.

33. At the September 17 meeting Michaud asked Barter whether she had given a copy of her email to Campbell. She said she had not but that she had gone over the issues in the email with him. Campbell confirmed that a meeting had occurred, but he thought this was a reference to the meeting on September 14. There had been no point by point discussion between Campbell and Barter of the issues raised in Barter's email. At the meeting Michaud again instructed Barter to provide a copy of the email to Campbell. She did not do so, and Campbell did not receive a copy of the email until he was given one by Michaud in October.

34. Michaud and LaFortune did not consider Barter's email to raise a claim of sexual harassment or discrimination. They did address the issues that had arisen with respect to the respective roles of Campbell as Principal and Barter as Assistant Principal. They emphasized to Barter that with a new Principal with expertise in proficiency-based education, her role had to change. They also told her that Campbell would now be her supervisor and that he would be the person to determine the responsibilities of the Principal and those of the Assistant Principal.

---

[7] The secretary in question testified that Campbell had called her "hon" once but that she was not offended, that there had never been an incident where a custodian was transferred, and that she gets called 'hon" in restaurants.

9

35. As noted above, Michaud and LaFortune had been told by former Superintendent Welsh that there had been transparency and trust concerns with respect to Barter in the past. By the time of the September 17 meeting they had had their own opportunity to assess both Campbell and Barter.

36. Under the prior administration all administrative-level personnel had been supervised by Superintendent Welsh and Barter's nominal supervisor under her contract was the Superintendent (or in this case the Acting Superintendents). However, there had never been any problem with the respective roles of the Principal and the Assistant Principal during Bob Strong's tenure because Strong had ceded the proficiency-based curriculum work to Barter. Once Campbell arrived and issues arose, the line of authority between Principal and Assistant Principal had to be resolved. In that event, Michaud and LaFortune determined that the Principal had to have the final say. This had in fact previously been evident to Barter because, from the time of Campbell's arrival, she had been asking him for clarification from him as to what her job duties would be.

37. Campbell's "commando" comment was not raised at the September 17 meeting, and Campbell did not know that Barter had raised that issue until he finally received Barter's September 14 email in late October. Campbell's one-time "hon" comment on June 9 was discussed, at the September 17 meeting. Campbell said he had apologized at the time and he apologized again at the September 17 meeting.

38. At the September 17 meeting Michaud also asked Barter how she was doing on her personal growth plan, and she said she had not worked on that yet but would do it as soon as she could.

39. On September 17, the date of the meeting with the Acting Superintendents, Campbell made a minor editing change to the Google Doc created around August 21 that set forth the division of responsibilities between Campbell and Barter.

40. In light of past events, the dealings between Campbell and Barter were strained, and there continued to be instances in which Campbell believed that Barter was attempting to undercut his efforts. *See* Exhibit 51.

41. Both before and after the September 17 meeting, as Campbell settled in as Principal and started tackling the work necessary to implement a proficiency-based curriculum, he found out that the high school was farther behind than he had expected. Campbell began focusing more and more on proficiency-based education issues and ceased to involve Barter very much in the PBE initiative.

42. In light of his workload, Campbell also assigned the Attendance Coordinator duties to Barter. This was confirmed by a change on September 28 to the Google Doc that moved Attendance Coordinator to "AM Lead Person" column. This was the only major change in the Google Doc. A number of new items were added at the bottom of the "Brian Lead Person" column, presumably because Campbell's first month of school had alerted him to things of which he had previously been unaware. Although the "Shared Responsibility" column had been removed, several of those items were moved to the "AM" column with the notation "as assigned."

43. There was a dispute as to whether Barter was notified of the September 28 editorial changes made on the Google Doc. Campbell testified that both he and Barter had access to and could revise the document and that he understood that when revisions were made by one, the document was sent to the other person if the "share" button was pressed. Barter testified that she never saw the September 28 revision until sometime after October. As far as the court can tell, the

11

issue of whether a notification to Barter of the September 28 changes was actually sent depends on the settings in place and whether the share button was correctly utilized, and the court is unable to resolve that issue.[8] However, it finds that Campbell intended to send the September 28 revisions to Barter, even if she did not receive them, because questions addressed to her were added to certain items in the "AM" column.[9]

44. Although Barter's role relating to proficiency-based curriculum had changed and she had now been given the attendance coordinator duties, the court does not find that she was marginalized or excluded in connection with administrative team meetings, with professional learning group sessions, with teacher in-service training days, or in other aspects of her duties.

45. On October 2, Barter met with Acting Superintendent LaFortune about revisions to the high school handbook. She had been asked by Michaud in early September to correct the draft handbook, which at that time included an inaccurate list of school policies, and she had agreed to do so. At her October 2 meeting with LaFortune, Barter provided a revised version of the handbook. LaFortune, consulting a list of the necessary policies, noted that the revised handbook was still not correct. Barter told him that she had not seen the list of required policies, and LaFortune gave her a copy.

46. Barter thereafter corrected the handbook. However, immediately after his meeting with Barter on October 2, LaFortune learned that a memo with the list of required policies had been previously provided to administrators on two prior occasions. He then sent Barter an email noting the discrepancy with her statement that she had not seen that list before. In response, Barter sent

---

[8] Contrary to the suggestion in plaintiff's post-trial reply brief, the court cannot go beyond the evidence presented at trial by attempting to discern the answer from the Google website.

[9] By way of example, the following question was added in the September 28 document after the item "Math Every Day curriculum" in the "AM" column: "WHAT IS THIS AND WHERE IS IT BEING USED?" Questions addressed to Barter were also added after two other entries.

12

an email stating that she took full responsibility for not knowing about the memo. Although she had agreed to correct the handbook in September, Barter also stated in her October 2 email that she had not understood prior to her October 2 meeting with LaFortune that the handbook had been her responsibility, suggesting that it had previously been Campbell's task.

47. This did not satisfy LaFortune, who wrote a letter to Barter on October 14, with a copy to her personnel file, stating that he had learned that Barter had been given a list of the required policies at the September 8 meeting with Michaud. The letter stated that LaFortune believed that Barter had purposely misled him.

48. Michaud had not in fact provided a list of required policies to Barter on September 8, and LaFortune's charge that Barter had misled him on this issue was therefore incorrect.

49. On October 14 Acting Superintendent Michaud had requested that the three administrators who were on personal growth plans scheduled for completion at the end of 2014 to schedule meetings with him to review their progress. Barter scheduled her meeting for October 21.

50. Although she testified at trial that she had virtually completed her plan, she acknowledged on cross examination she did not at that time have any of the items listed in the "Evidence of Completion" column.

51. With her evaluation meeting with Michaud upcoming on the following Tuesday, Barter emailed the secretary in the Superintendent's office on Saturday October 18 to ask the identity of the RSU 5 Affirmative Action Officer. Barter was informed the following Monday, October 20, that the affirmative action officers were Beth Wilhoite and Ray Grogan. They were newly appointed because the previous affirmative action officer had retired and had not been immediately replaced.

52. Late on the morning of Monday October 20, Barter called Michaud and requested that her personal growth meeting be rescheduled. When he asked why, she told him that she needed more time to prepare and that given his tone, she did not think the climate for a conversation was conducive to professional growth. Michaud declined to postpone the meeting. Barter did not state in that telephone conference that she wanted to consult an affirmative action officer before attending the meeting.

53. Barter then arranged to meet with Beth Wilhoite the following afternoon, around the same time she was scheduled to meet with Michaud. Barter believed she was being treated unfairly, but she arranged her meeting with Wilhoite at the same time as her scheduled meeting with Michaud because she had not made progress on the tasks set forth in her personal growth plan and because she could see that Michaud and LaFortune did not have a favorable assessment of her.

54. On October 21 at 2:06pm, 30 minutes before she was scheduled to meet with Michaud, Barter sent Michaud an email saying that she would not attend the meeting and she would be out at a doctor's appointment on October 22. She repeated the reasons she had given for her earlier request to postpone and she added that she believed she was being held to a different standard than other administrators and accordingly had scheduled a meeting with Beth Wilhoite.[10] Neither Barter's October 21 email nor her postponement request the previous day cited any medical issues as a reason for postponement or nonattendance.

55. After learning that Barter would not attend the scheduled meeting, Michaud attempted to call Freeport High School and was informed that Barter had left for the day. He then wrote a

---

[10] Wilhoite has since died. At trial Barter testified that Wilhoite had recommended that Barter not attend the personal growth meeting with Michaud and that Barter should have someone go to the meeting with her. Although there was a hearsay objection, the court agrees that Barter's testimony as to Wilhoite's statements is admissible under Rule 801(2)(D). However, the court does not credit Barter's testimony that Wilhoite recommended that Barter not go to the personal growth meeting. Barter had made that decision before she met with Wilhoite.

letter to Barter raising three issues, with a copy to her personnel file. The first issue was that because Barter had told him approximately a month earlier that she would complete the tasks in her personal growth plan, the conclusion he drew from her refusal to meet was that she had not completed any of the tasks set forth in the plan. The second issue was his understanding that Barter had met with a School Board member on October 20 about her employment situation but the school board member had thought Barter's request for a meeting concerned the School Board member's daughter, which Michaud characterized as inappropriate behavior in Barter's part. The third issue was that Michaud understood that Campbell had not been aware that Barter had left the High School that afternoon or that she planned to be out for a medical appointment the following day, and Michaud instructed Barter to inform Campbell whenever she would be absent.

56. By this point Barter was very upset by the overall situation. When she saw her doctor on October 22, this had apparently begun to affect her physically as well, and her doctor concluded that she was sufficiently affected that she should not return to work.

57. Barter thereafter remained on medical leave until March 2015, when she resigned from employment with RSU 5 after accepting a job with the Barbara Bush Foundation.

58. The complaints made in Barter's September 14 email about Campbell's use of "hon" and his recounting his "commando" sleep study experience did not motivate Acting Superintendents Michaud and LaFortune to inform Barter that Campbell would be her primary supervisor on September 17. They did that because they reasonably believed that when issues arose as to the division of responsibility between Campbell as Principal and Barter as Assistant Principal, the Principal should have the authority to decide.

59. To the extent that Michaud and LaFortune were unsympathetic to Barter, this was not motivated by the "hon" and "commando" complaints in her October 14 email. They were instead

15

responding to Barter's continued resistance to Campbell's role as Principal and their own assessment, consistent with Shannon Welsh's concerns, that Barter did not act in a transparent fashion. This was exemplified by Barter's October 14 email in which she sought to meet with Michaud in Campbell's absence and gave her version of the issues in an email on which Campbell was not copied and which she did not provide to Campbell although she was twice instructed to do so.

60. LaFortune's October 14 letter reprimanding Barter for misleading him was not motivated by Barter's "hon" and "commando" complaints but, as he stated, from his belief (although incorrect) that she had misled him because she had been given a list of handbook policies by Michaud. La Fortune could perhaps have reprimanded Barter for contending in her October 2 email that she had not previously been given responsibility for the handbook, but he did not do so. His reprimand based on a list of policies that she was not in fact given was unwarranted.

61. Michaud's October 21 reprimand letter was not motivated by Barter's "hon" and "commando" complaints but resulted from Michaud's unhappiness that she had refused to attend the personal growth meeting even though he had told her he was unwilling to reschedule it, by Michaud's belief that she had not done any work on her personal growth plan, and by the other concerns stated in his letter.

62. Campbell's actions and attitude toward Barter were not motivated by the "hon" and "commando" complaints included in her September 14 email – which he did not even see until October – but from a belief on his part that she was attempting to undercut him and was not being transparent. Barter's efforts to undercut Campbell and her lack of transparency were substantiated by evidence admitted at the trial. Under the circumstances, Campbell reasonably chose to limit

Barter's role with respect to proficiency-based curriculum and to assign to Barter the Attendance Coordinator duty that he did not have time to do.

63. The parties agree that the burden-shifting analysis originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and adopted by the Law Court in *Maine Human Rights Commission v. City of Auburn*, 408 A.2d 1253, 1261 (Me. 1979), applies to retaliation claims under 5 M.R.S. § 4633(1).[11]

64. Under *McDonnell Douglas* Barter must first make out a prima facie case of retaliation by showing (1) that she engaged in a statutorily protected activity, (2) that RSU 5 made an employment decision that adversely affected her, and (3) that there was a causal link between the two. *E.g., Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80 ¶ 21, 45 A.3d 722. Once a prima facie showing has been made, RSU 5 must proffer a legitimate, non-retaliatory reason for the adverse employment action. Barter then has the burden of demonstrating that the proffered reason was a pretext and that the adverse action was substantially motivated at least in part by her protected activity. *E.g., Trott v. H.D. Goodall Hospital*, 2013 ME 33 ¶ 15, 66 A.3d 7. Barter retains the final burden on the issue of causation. *DiCentes v. Michaud*, 1998 ME 227 ¶16, 719 A.2d 509.

65. On the issue of whether there were adverse employment decisions that were significant enough to support a claim of retaliation – if the other elements of Barter's cause of action were met – the court does not find that the evidence supports all of the adverse actions that Barter contends were directed at her. However, the court concludes that some of the actions taken by

---

[11] In *Brady v. Cumberland County*, 2015 ME 143 ¶¶ 39, 126 A.3d 1145, the Law Court found the *McDonnell Douglas* framework to be unnecessary for purposes of evaluating motions for summary judgment in retaliation cases under the Whistleblowers' Act. It is likely that the Law Court would reach the same result with respect to summary judgment motions in retaliation cases under section 4633(1) of the Human Rights Act. *Brady* reserved the question of whether, in retaliation cases, the *McDonnell Douglas* framework should continue to be utilized at trial. 2015 ME 143 ¶ 39 n.9. This does not affect the result in this case because, whether or not *McDonnell Douglas* is applied, Barter would retain the ultimate burden of demonstrating that adverse employment action taken against her was motivated at least in part by protected activity.

RSU 5, including the decision to place her under Campbell's supervision and the Acting Superintendents' letters of reprimand, were significant enough to constitute adverse action. *See Carmona-Rivera v. Commonwealth of Puerto Rico*, 464 F.3d 14, 19 (1st Cir. 2006) (to support a retaliation claim, the alleged retaliatory action must be significant rather than trivial). The remaining questions are whether Barter has demonstrated that she engaged in protected activity and whether she has demonstrated a sufficient causal connection between protected activity and the allegedly retaliatory actions.

66. An employee's complaints to her supervisors that she is being unlawfully discriminated against or sexually harassed may qualify as protected activity under 5 M.R.S. § 4633(1). *See, e.g., Benoit v. Technical Manufacturing Corp.*, 331 F.3d 166, 175 (1st Cir. 2003). This is true even if the actions or practices that were the subject of the employee's complaints were not in fact violations of the anti-discrimination laws, so long as the employee has a reasonable belief that the actions complained of constituted unlawful discrimination and communicated that belief to the employer in good faith. *Id. Accord, Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261-62 (1st Cr. 1999), cited by the Law Court in *Galouch v. Department of Professional and Financial Regulation*, 2015 ME 44 ¶ 14, 114 A.3d 988.

67. In this case a "Thanks, hon" comment directed from a male principal to a female assistant principal was inappropriate and could reasonably be seen as unprofessional and as condescending on the basis of gender. However, the comment was directed to Barter on only one occasion. After Barter told Campbell that she preferred not to be called "hon," Campbell never called her "hon" again. The one-time use of "hon" toward Barter could not reasonably have been believed to constitute unlawful gender discrimination or sexual harassment.

18

68. Campbell's sleep study anecdote also could not reasonably have been believed to constitute sexual discrimination or harassment. This was an embarrassing story told by Campbell at his own expense. Barter's testimony did not suggest that he had told the story in a suggestive or sexualized manner, and she acknowledged that other listeners found it amusing.

69. Neither Campbell's mention of his commando sleep study nor his use of "hon" – toward Barter on one occasion, toward a student on one occasion, and toward a secretary who was not offended on one occasion – rose to the level of what could be reasonably be considered to constitute a hostile environment.

70. In addition, while Barter was offended by Campbell's use of "hon" and his mention of a commando sleep study, her complaints about those events were not made in a good faith belief that those comments constituted unlawful discrimination but were part of her attempts to undercut Campbell.

71. Accordingly, the court does not find that Barter has met her burden of showing by a preponderance of the evidence that she engaged in protected activity.

72. Perhaps more importantly, even if Barter's complaints had constituted protected activity, the court does not find that she has met her burden of showing that there was a causal connection between her complaints and what she contends were retaliatory actions taken by Campbell, Michaud, and LaFortune. *See* ¶¶58-62 above.

73. In her post-trial submissions Barter focuses on some inconsistencies in the testimony of Campbell, Michaud, and LaFortune that she contends demonstrate that the reasons given for their actions were pretextual. The court has considered her arguments but is unpersuaded.

74. Although Barter was treated unfairly in one instance – LaFortune's letter of reprimand based on his incorrect belief that Barter had been handed a list of handbook policies – this did not

stem from Barter's complaints about Campbell but rather from an assessment LaFortune had formed as to Barter's trustworthiness. Just as the employment discrimination laws do not establish an overall code of civility in the workplace, *Oncale v. Sundowner Offshore Services,* 523 U.S. 75, 81 (1998), they do not – in the absence of unlawful discrimination or retaliation for protected activity – provide a remedy for every incident of unfairness in the workplace.

The entry shall be:

Judgment shall be entered for defendant Regional School Unit 5 dismissing the complaint brought by plaintiff Ann Marie Barter. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: April __24__, 2018

Thomas D. Warren
Justice, Superior Court